2002 UT 79

**Rhonda Lee LANEY, individually and as guardian ad litem of S.B. and R.A., minors, Plaintiff and Appellant,**

v.

**FAIRVIEW CITY, a municipal corporation, Defendant and Appellee.**

No. 981729.

Supreme Court of Utah.

Aug. 9, 2002.

Rehearing Denied Oct. 29, 2002.

Brent D. Young, Provo, for plaintiff.

Andrew M. Morse, Keith A. Call, Salt Lake City, for defendant.

Mark L. Shurtleff, Att'y Gen., Brent A. Burnett, Asst. Att'y Gen., Salt Lake City, for amicus the State of Utah.

DURHAM, Chief Justice:

¶ 1 This case addresses whether Utah Code Ann. § 63–30–2(4)(a) (Supp.2000) violates article I, section 11, the "open courts" clause, of the Utah Constitution. The district court held that Fairview City (the City) is immune from suit for its alleged negligence under the Utah Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 to –38 (1997 & Supp.2000).[1] We hold that the 1987 amendment, declaring all acts of municipalities to be governmental functions, is unconstitutional as applied to municipalities operating electrical power systems. We reverse the summary judgment of the trial court and remand for a trial on the merits without any defense of governmental immunity.

## BACKGROUND

¶ 2 The following facts were undisputed in the trial court. On September 16, 1991, John Laney was electrocuted and killed while moving irrigation pipe. The thirty-foot aluminum water irrigation pipe that Laney was carrying came into contact with, or within arcing distance of, high voltage power lines. The power lines were owned by the City.

¶ 3 Accordingly, Laney's wife and children brought a wrongful death action against the City claiming, inter alia, that the City was negligent for failing to maintain the power lines in a safe condition. The Laneys com-

---

1. The statutory provisions pertinent to this opinion that were in effect at the time of death of plaintiff's husband do not differ in any material respect from the current statute.

plain that the power lines did not meet minimum safety standards because they were too low to the ground. They also allege that the lines were unsafe because they were not insulated and did not contain warnings.

¶ 4 The City moved for summary judgment asserting that the decision whether or not to improve the power lines was a discretionary function entitled to immunity under Utah Code Ann. § 63–30–10(1) (1997). Discretionary function immunity is an exception to a waiver of sovereign immunity within the Utah Governmental Immunity Act. The Utah Governmental Immunity Act declares that all governmental entities are immune from suit for any injury which results from the exercise of a "governmental function." *See* Utah Code Ann. § 63–30–3(1).[2] The term governmental function is broadly defined in section 63–30–2(4)(a), and by virtue of that broad definition, the statute cloaks governmental entities with immunity for a wide range of activities.[3] However, Utah Code Ann. § 63–30–10 waives sovereign immunity "for injury proximately caused by a negligent act or omission." Then, subsection (1) creates an exception to this waiver for negligence and immunizes governmental entities for "the exercise or performance or the failure to exercise or perform a discretionary function...." Utah Code Ann. § 63–30–10(1).

¶ 5 The district court agreed that the City was entitled to immunity for its decision to not improve the power lines and granted the City's motion for summary judgment. Following the framework we set forth in *Ledfors v. Emery County School District*, 849 P.2d 1162, 1164 (Utah 1993),[4] the district court concluded that the City's operation of its municipal power system was a governmental function as defined by Utah Code Ann. § 63–30–2(4)(a). The court also concluded that immunity was waived under section 63–30–10 because plaintiffs' claim against the City was for negligence. Finally, the district court concluded that the City's decision to keep its power lines at the height and condition they were in at the time of Mr. Laney's death constituted the exercise of a discretionary function under Utah Code Ann. § 63–30–10(1), an exception to the waiver for negligence, rendering the City immune from suit under the Utah Governmental Immunity Act.

¶ 6 Plaintiffs appeal, claiming that Utah Code Ann. § 63–30–2(4)(a) is unconstitutional because it violates article I, section 11, the open courts clause, of the Utah Constitution. Plaintiffs further maintain that the district court erred in concluding that the City is entitled to discretionary function immunity under Utah Code Ann. § 63–30–10.

## ANALYSIS

¶ 7 We note the long-standing principle that "unnecessary decisions are to be avoided and that the courts should pass upon the constitutionality of a statute only when such a determination is essential to the decision in a case." *Hoyle v. Monson*, 606 P.2d 240, 242 (Utah 1980). If the district court erred in concluding that the City was immune from suit under the statute, there will be no need to address the constitutional issue before us. We therefore address the statutory interpretation question first.

2. "Except as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function...." Utah Code Ann. § 63–30–3(1).

3. " 'Governmental function' means any act, failure to act, operation, function, or undertaking of a governmental entity whether or not the act, failure to act, operation, function, or undertaking is characterized as governmental, proprietary, a core governmental function, unique to government, undertaken in a dual capacity, essential to or not essential to a government or governmental function, or could be performed by private enterprise or private persons." Utah Code Ann. § 63–30–2(4)(a).

4. "The Utah Governmental Immunity Act requires that we address three questions in determining whether a governmental entity is immune from suit. First, was the activity the entity performed a governmental function and therefore immunized from suit by the general grant of immunity contained in section 63–30–3. Utah Code Ann. § 63–30–3 (1989) [now codified at section 63–30–3(1)]. Second, if the activity was a governmental function, has some other section of the Act waived that blanket immunity? Third, if the blanket immunity has been waived, does the Act also contain an exception to that waiver which results in a retention of immunity against the particular claim asserted in this case?" *Ledfors*, 849 P.2d at 1164.

## I. DISCRETIONARY FUNCTION IMMUNITY UNDER THE UTAH GOVERNMENTAL IMMUNITY ACT

¶ 8 The appellants argue that the district court erred in granting the City's motion for summary judgment based on its conclusion that the City's omissions to not increase the height of the power lines, to not insulate the lines, and to not provide warning signs near the lines, were immune from suit under the Utah Governmental Immunity Act.

### A. Standard of Review

██ ¶ 9 Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). When reviewing a grant of summary judgment, as we do here, we review the district court's conclusions of law for correctness. *See Taylor v. Ogden Sch. Dist.*, 927 P.2d 159, 162 (Utah 1996). We therefore grant no deference to the district court's conclusion that the City is entitled to discretionary function immunity under Utah Code Ann. § 63–30–10.

### B. Discretionary Function Immunity

██ ¶ 10 Plaintiffs argue that maintenance of power lines is not a discretionary function entitled to immunity under Utah Code Ann. § 63–30–10. Instead, they assert, the City owes a duty to exercise the highest degree of care to protect the public because it undertook to operate and maintain power lines. The City, on the other hand, contends that decisions to use city funds to improve *existing* power lines, decisions to raise the height of the lines, to insulate them, or to provide additional warnings, constitute the exercise of a discretionary function. For the reasons that follow, we conclude that the City's decisions or omissions—regarding the height and insulation of the power lines, and adjacent warning signs—are discretionary functions for which sovereign immunity has not been waived under the Utah Governmental Immunity Act.

¶ 11 As noted above, we must address three questions in determining whether a governmental entity is immune from suit under the Utah Governmental Immunity Act. First, we must address whether the City's operation of power lines is a governmental function and therefore immunized from suit by the general grant of immunity contained in section 63–30–3(1). *See Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1164 (Utah 1993). Second, if the operation of power lines is a governmental function, we must determine whether some other section of the Act has waived the blanket immunity in section 63–30–3(1). *See id.* Finally, if the blanket immunity has been waived, we must determine whether the Act contains an exception to that waiver which results in a retention of immunity against the particular claim asserted by the plaintiffs in this case. *See id.*

¶ 12 We answer the first question, does the City's operation of power lines constitute a governmental function, in the affirmative. Section 63–30–3(1) states, "Except as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function...." Utah Code Ann. § 63–30–3(1).[5] Section 63–30–2(4)(a) states that

> 'Governmental function' means any act, failure to act, operation, function, or undertaking of a governmental entity whether or not the act, failure to act, operation, function, or undertaking is characterized as governmental, proprietary, a core governmental function, unique to government, undertaken in a dual capacity, essential to or not essential to a government or governmental function, or could be performed by private enterprise or private persons.

Utah Code Ann. § 63–30–2(4)(a). Under this definition, the City's operation of power lines is a governmental function, and the City is therefore immunized from suit by the general grant of immunity contained in section 63–30–3(1).

---

**5.** Defendant Fairview City is a governmental entity under the Act. *See* Utah Code Ann. § 63–30–2(3) (Supp.2000) (stating " 'Governmental entity' means the state and its political subdivisions as defined in this chapter."); Utah Code Ann. § 63– 30–2(7) (Supp.2000) (stating " 'Political subdivision' means any county, city, town, . . . or other governmental subdivision or public corporation.").

¶ 13 We also answer the second question, does some other section of the Act waive the blanket immunity in section 63–30–3(1), in the affirmative. Utah Code Ann. § 63–30–10 states, in pertinent part:

Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if. . . .

In this section, the legislature has waived the blanket coverage of sovereign immunity outlined in sections 63–30–3(1) and 63–30–2(4)(a) for negligence committed by governmental entities through their employees. In this case, appellants allege the City was negligent, and the Act waives immunity for that negligence.

¶ 14 The third question, does the Act contain an exception to the blanket waiver of immunity that results in a retention of immunity against the particular claim asserted by the plaintiffs in this case, is more complicated. Utah Code Ann. § 63–30–10 states:

Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment *except* if the injury arises out of, in connection with, or results from:

(1) the exercise or performance or the failure to exercise or perform a *discretionary function*, whether or not the discretion is abused;

(emphasis added). Clearly, this section contains an exception to the waiver of blanket immunity, and the exception results in a retention of immunity for discretionary functions. Therefore, to determine whether the City has immunity against appellants' claims, we must determine whether the allegedly negligent decisions or omissions of the City constitute discretionary functions under the Act.

¶ 15 The test used to determine whether a governmental act, omission, or decision qualifies as a discretionary function under section 63–30–10(1) requires a four-part inquiry. *See Keegan v. State*, 896 P.2d 618, 624 (Utah 1995). An affirmative response to each inquiry leads to the conclusion that the action under review is a discretionary function. While the test was most re-

cently applied by this court in *Keegan*, it first appeared in *Little v. Utah State Division of Family Services*, 667 P.2d 49, 51 (Utah 1983), and includes the following:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?

(2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?

(3) Does the. act, omission, or decision' require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?

(4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*See Keegan*, 896 P.2d at 624 (Utah 1995); *accord Trujillo v. Utah Dep't. of Transp.*, 1999 UT App. 227, ¶ 27, 986 P.2d 752; *Little*, 667 P.2d at 51 (quoting *Evangelical United Brethren Church of Adna v. State*, 67 Wash.2d 246, 407 P.2d 440, 445 (1965)).

¶ 16 Although a party's entitlement to discretionary function immunity is a question of law, a court must have sufficient facts before it to determine whether the challenged act, omission, or decision satisfies the four-part *Little* test. *See, e.g., Rocky Mountain Thrift v. Salt Lake City*, 784 P.2d 459, 464 (Utah 1989); *Hansen v. Salt Lake County*, 794 P.2d 838, 840 (Utah 1990); *Trujillo*, 1999 UT App. 227 at ¶¶ 28, 43, 986 P.2d 752. The record in the present case contains sufficient facts to apply the *Little* test.

¶ 17 We first note that the discretionary function analysis in *Little* depends on which specific act, omission, or decision is being challenged by the plaintiffs, *see, e.g., Rocky Mountain Thrift*, 784 P.2d at 461–64, *Trujillo*, 1999 UT App. 227 at ¶¶ 29–37, 986 P.2d 752, and whether it involves a basic governmental policy, program, or objective. The decisions or omissions challenged by the plaintiffs in this case are those that resulted in not raising the height of the power lines,

not insulating the power lines, and not providing further warnings, all pertinent to the safety of members of the public who might encounter the lines. These challenged decisions are closely connected to the basic governmental objective of public safety. Because the plaintiffs' complaint specifically identifies the City's failure to adequately make the lines safe as the basis of their action, our analysis is limited to reviewing the challenged decisions in that light. As such, the challenged act, omission, or decision does necessarily involve a basic policy, program, or objective, namely public safety, and the first part of the *Little* inquiry is answered affirmatively.

¶ 18 Second, we conclude that the questioned omissions or decisions regarding the safety of the power lines are essential to the realization or accomplishment of the policy, program, or objective identified here— public safety. Again, because the plaintiffs allege the City failed to adequately warn or make the power lines safe by raising or insulating them, "that policy, program, or objective" subject to analysis is the promotion of public safety. *Little*, 667 P.2d at 51. Decisions touching the safety of the power lines clearly affect the accomplishment of the objective of public safety. Consequently, part two of the *Little* inquiry is also answered in the affirmative.

¶ 19 Third, the challenged act, omission, or decision regarding the power lines requires the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved. Although we are not presented with evidence regarding whether the City actually conducted on-site inspections, analyzed various safety factors, or conducted collaborative review of its decision not to raise the power lines, we think that the decision required, at a minimum, a basic cost-benefit analysis and exercise of financial expertise and judgment by the City. This is sufficient under part three of the *Little* test.

¶ 20 Finally, we also answer the fourth question in the affirmative. Under Utah Code Ann. § 10–8–14 (Supp.2001), the City is authorized to own and operate an electric utility. *Id. see also* Utah Const. art. XI, § 5. Thus, the City has the requisite authority to decide whether or not to raise the lines or otherwise make them more safe.

¶ 21 Having answered all four parts of the *Little* test in the affirmative, we conclude that the challenged decisions or omissions were discretionary functions. Our review of other Utah case law also supports the conclusion that the City's decisions not to increase the height of the power lines, not to insulate the lines, and not to provide warning signs, are discretionary functions entitled to immunity under the Act.

¶ 22 First, the City's decisions not to raise, insulate, or place warnings on its power lines are not operational decisions involving routine, everyday matters. Rather, those are broad policy decisions requiring evaluation of broad policy factors which take place at the policy-making level, and such decisions are generally entitled to discretionary function immunity. *See, e.g., Bigelow v. Ingersoll,* 618 P.2d 50, 53 (Utah 1980) (stating that "discretionary function [immunity] under § 63–30–10(1) is confined to those decisions and acts occurring at the 'basic policy making level,' and is not extended to those acts and decisions taking place at the operational level, or, in other words '... those which concern routine, everyday matters, not requiring evaluation of broad policy factors' " (quoting *Frank v. State,* 613 P.2d 517, 520 (Utah 1980) (quoting *Carroll v. State Rd. Comm'n,* 27 Utah 2d 384, 388, 496 P.2d 888, 891))); *Frank,* 613 P.2d at 520 (indicating that even though almost all acts require some degree of discretion, the discretionary function exception immunizes governmental entities from suit for "those decisions and acts occurring at the 'basic policy-making level,' and not extended to those acts and decisions taking place at the operational level, or, in other words,' ... those which concern routine, everyday matters, not requiring evaluation of broad policy factors' ") (quoting *Carroll,* 27 Utah 2d at 389, 496 P.2d at 891); *Carroll,* 27 Utah 2d at 389–90, 496 P.2d at 891–92 (finding that "the decision of the road supervisor to use berms [to prevent accidents on a roadway] was not a basic policy decision essential to the realization or accomplishment of some basic governmental policy, program, or objective [because] his decision

did not require the exercise of basic policy evaluation, judgment, and expertise on the part of the Road Commission [and because] [h]is determination may properly be characterized as one at the operational level of decision making"); *see also, Evangelical United Brethren Church*, 407 P.2d at 444 (stating that "the distinction between discretionary and nondiscretionary administrative acts, omissions, or decisions may well lie in the determination of whether such was done or made at the planning or operational level") (citing *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)).

¶ 23 Second, our conclusion that the City's decision regarding its power lines is entitled to discretionary function immunity is consistent with cases that have generally held that decisions balancing the need for safety improvements against limited governmental funding are entitled to discretionary function immunity. *See Keegan v. State*, 896 P.2d at 624–26 (applying the four part *Little* test and concluding that the Utah Department of Transportation's decision not to raise a concrete traffic barrier was a discretionary function because it "resulted from a considered weighing of the costs and benefits of certain safety and construction policies and which involved the exercise of UDOT's judgment and discretion"); *Velasquez v. Union Pac. R.R.*, 24 Utah 2d 217, 218–19, 469 P.2d 5, 6 (1970) (finding the Utah Public Service Commission was immune from suit for its (1) failure to require the railroad to construct and maintain safety devices and (2) failure to establish a program to discover dilapidated signs and indicating that the plaintiff should not necessarily recover "simply because a better warning signal could or should have been installed"); *Duncan v. Union Pac. R.R.*, 790 P.2d 595, 601–02 (Utah Ct.App. 1990) (concluding that UDOT was "immune for its failure to do more than minimal warning and control," and stating, "Every highway could probably be made safer by further expenditures, but we will not hold UDOT (and implicitly, the legislature) negligent for having to strike a difficult balance between the need for greater safety and the burden of funding improvements"), *aff'd* 842 P.2d 832 (Utah 1992); *Gleave v. Denver & Rio Grande W. R.R.*, 749 P.2d 660, 668–69 (Utah Ct.App.1988) (holding that "UDOT's failure

to install different safety signals or devices at the subject crossing was a purely discretionary function within the meaning of section 63–30–10(1)(a)" because (1) the challenged omission, failure to install different safety devices, involved the basic governmental objective of promoting public safety; (2) evaluating numerous railroad crossings and assigning priorities for safety signal upgrades was essential to the realization of public safety, especially in light of the fact that unlimited funds were not available to upgrade all needy crossings at once; (3) the decision whether to improve the traffic signals was the exercise of basic policy judgment because UDOT conducted on-site inspections, analyzed several safety factors, and participated in collective decision-making; and (4) UDOT was statutorily empowered to supervise and regulate the safety of the railroad crossings).

¶ 24 It is undisputed that the standards used in the electrical power industry in Utah follow those set forth in the National Electric Safety Code ("NESC"). Section 232 of the 1987 edition of the NESC, which was in effect at the time of Mr. Laney's accident, provides that power lines over farm land be at least eighteen feet above the ground. The power line at issue was over twenty-eight feet above the ground, thereby exceeding the standard set forth by the NESC. The NESC further provides that power lines are insulated when they are separated from other conducting surfaces by air space, as was the case here.

¶ 25 We wish to emphasize, however, that it would *not* be within a municipality's discretion to construct electrical systems and power lines that do not meet industry safety standards. Here, the City's electrical system, including the power line that caused Mr. Laney's death, met all applicable industry safety standards. Therefore, a decision by the City to not improve its power lines above industry standards is discretionary and is entitled to discretionary function immunity under the Act.

¶ 26 In sum, we conclude that the trial court was correct in concluding that the City was immune from suit under the Act. The alleged negligence of the City in failing to

raise the height of, insulate, or provide further warnings on its power lines, resulted from the performance of discretionary functions under the *Little* test. Consequently, the Act immunizes the City from suit for the negligence alleged by the plaintiffs.

## II. CONSTITUTIONALITY OF UTAH CODE ANN. § 63–30–2(4)(a)

■■■■ ¶ 27 Because we find that the City's maintenance of the power lines constitutes a discretionary function within the meaning of the Governmental Immunity Act, we must address the plaintiffs' challenge to the constitutionality of Utah Code Ann. § 63–30–2(4)(a) (Supp.2000).

¶ 28 As explained above, the Utah Governmental Immunity Act grants the City immunity from suit for its decision not to increase the safety of its power lines. This is, in part, because the City's operation of its municipal power system is a governmental function under Utah Code Ann. § 63–30–2(4)(a). Accordingly, absent a statutory or constitutional provision to the contrary, the City is entitled to immunity from suit regarding the maintenance of its power lines, a governmental function. Plaintiffs contend that the district court erred in determining that the City is entitled to claim immunity because section 63–30–2(4)(a)'s definition of "governmental function" renders it unconstitutional. Article I, section 11 of the Utah Constitution provides:

> All courts shall be open, and every person, for an injury done to him in his person, property, or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this state, by himself or counsel any civil cause to which he is a party.

Plaintiffs argue that the Act, specifically section 63–30–2(4)(a), deprives them of their rights guaranteed by article I, section 11, the open courts clause.

### A. Berry v. Beech Aircraft Analysis

¶ 29 The State urges this court to abandon nearly a century of precedent, arguing for an interpretation that would virtually write article I, section 11 out of the Utah Constitution. Specifically, the State asks the court to overrule *Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985), and the principles explained therein. As early as 1915, only twenty years after Utah's constitution was adopted, this court acknowledged that article I, section 11 placed "a limitation upon the Legislature to prevent that branch of the state government from closing the doors of the courts against any person who has a legal right which is enforceable in accordance with some known remedy." *Brown v. Wightman*, 47 Utah 31, 34, 151 P. 366, 366–67 (Utah 1915). Thus, the State's assertion that the provision speaks only to the judicial branch and not to the legislative branch, is a novel departure indeed. *Berry* did not create a new constitutional rule; rather, it developed and articulated a test by which the rule might be applied.

### 1. Plain Meaning and Historical Purpose

¶ 30 In arguing for article I, section 11 to be treated solely as a procedural right, the State disregards the plain meaning and historical purpose of Utah's open courts provision. Throughout our state's history, this court has consistently recognized that the plain meaning of the guarantee "impose[s] some *substantive* limitation on the legislature to abolish judicial remedies in a capricious fashion." *Craftsman Builder's Supply v. Butler Mfg.*, 1999 UT 18, ¶ 36, 974 P.2d 1194 (Stewart, J., concurring) (emphasis added).

¶ 31 In general, open courts provisions in Utah and other states have served two principal purposes:

> First, they were intended to help establish an independent foundation for the judiciary as an institution. *See* Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or. L.Rev. 1279 (1995); *Industrial Comm'n v. Evans*, 52 Utah 394, 174 P. 825, 831 (1918) ("[T]he question of ultimate legal liability cannot be withdrawn from the courts."). Second, open courts or remedies clauses were intended to grant individuals rights to a judicial remedy for the protection of their person, property, or reputation from abrogation and *unreasonable limitation by economic interests that could control state legislatures. See* Schu-

man, 65 Temp. L.Rev. at 1208; *Berry,* 717 P.2d at 675.

*Craftsman,* 1999 UT 18 at ¶ 36, 974 P.2d 1194 (Stewart, J., concurring) (emphasis added).

¶ 32 Our holding in *Berry,* which recognizes the substantive protection of article I, section 11, is consistent with these general purposes. More importantly, however, we should rely on our own state history and precedent to determine the purpose and meaning of article I, section 11's protection. *See* David Schuman, *The Right to a Remedy,* 65 Temp. L.Rev. 1197, 1220 (1992) ("[T]he best interpretation of the remedy guarantee [6] in one state may differ radically from the best interpretation in another state, even when the wording of the two provisions is identical."). "[A] text's meaning cannot be separated from its speaker, its audience, its genre—from its context." *Id.* (citing Stanley Fish, *Working on the Chain Gang: Interpretation in Law and Literature,* 60 Tex. L.Rev. 551 (1982)). Our inquiry should focus on what the open courts provision means in our own constitution. *See* Schuman, 65 Temp. L.Rev. at 1220 ("[T]he appropriate inquiry is not, 'What does the remedy guarantee mean?,' but 'What does the remedy guarantee mean in the constitution of State X?'").

¶ 33 Although some states with open courts provisions have construed them to guarantee only procedural rights and court access, such a construction has never been accepted in Utah. Article I, section 11's constitutional guarantee has been interpreted to protect substantive rights to remedies throughout our state's history. The open courts provision was adopted, as part of the original Constitution itself, at the end of the nineteenth century, during a period when abuse had generated concern and distrust of the legislative branch in numerous states. *Craftsman,* 1999 UT 18 at ¶ 50, 974 P.2d 1194 (Stewart, J., concurring). That abuse included misuse of political influence by railroads and other corporate interests, who convinced state legislators to favor private interests through legislative enactments insulating them from the general laws. *Id.* (citing *Perkins v. Northeastern Log Homes,* 808 S.W.2d 809, 811–12 (Ky.1991); *Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961, 971–73 n. 9 (1984) to demonstrate origin of open courts provisions and industrial history of certain states around the turn of the century). To prevent this type of political abuse, "the Framers, relying on legal principles that were centuries old, included constitutional protections against such evils." *Id.*

¶ 34 Utah's constitution, in fact, contains numerous provisions reflecting an intent to limit legislative power and prevent special interest abuse. In addition to basic provisions for due process, uniform operation of the laws, and equality in civil and political rights, we find in the Utah Constitution the following sections, clearly motivated by a wariness of unlimited legislative power: [7]

1. Article I, section 23 "No law shall be passed granting irrevocably any franchise, privilege or immunity."

2. Article VI, section 22 (single-subject rule) "Except general appropriation bills and bills for the codification and general revision of laws, no bill shall be passed containing more than one subject, which shall be clearly expressed in its title."

3. Article VI, section 26 "No private or special law shall be enacted where a general law can be applicable."

4. Article VI, section 28 "The Legislature shall not delegate to any special commission, private corporation or association any power to make, supervise or interfere with any municipal improvement, money, property or effects; . . . to levy taxes, to select a capitol site, or to perform any municipal functions."

---

6. The terms "open courts provision" and "remedy guarantee" or "remedy provision" are used interchangeably by some commentators to refer to the various forms of open courts provisions found in states with this type of provision in their constitutions.

7. In her history of Utah's 1895 constitutional convention, Prof. Jean Bickmore White comments that the document produced "tried to address the needs of a semiarid, capital-starved western territory, but it also reflected the late nineteenth-century concern over the growing powers of corporations and trusts." Jean Bickmore White, *Charter for Statehood: The Story of Utah's State Constitution,* 46 (Univ. of Utah Press 1996) (hereinafter "White").

5. Article VII, section 29 "The Legislature shall not authorize the state, or any county, city, town, township, district or other political subdivision of the State to lend its credit or subscribe to stock or bonds in aid of any railroad, telegraph or other private individual or corporate enterprise or undertaking." [8]

6. Article XVI, section 5 "The right of action to recover for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, except in cases where compensation for injuries resulting in death is provided for by law." [9]

¶ 35 Commenting on Utah's legislative article (Article VI), historian Jean Bickmore White points out that it

is typical of the late-nineteenth-century constitutions written by its western neighbors.... It ... mandated that the legislature should not enact special laws ... where general laws could apply-but went on to list eighteen specific cases where there should be no private or special laws (Art. VI, sec. 26). It specified that (except for general appropriation bills and bills for the codification and general revision of laws) no bill should contain more than one subject-a provision that made the amendment of entire articles difficult.

White at 64.

¶ 36 It is very clear from Professor White's history and from the discussions recorded in the Official Report of the Proceedings and Debates of The Constitutional Convention for the State of Utah, *see Proceedings: Constitutional Convention in passim* (Star Printing Co. 1898), that Utah's framers were knowledgeable about contemporary constitutional debates, and sensitive to economic and individual rights issues common in sibling states. That being so, it is entirely plausible that the inclusion of a specific remedies pro-

vision in article I, section 11 was deliberate, especially given its textual differences from other contemporary constitutions. *See Craftsman,* 1999 UT 18 at ¶ 49, 974 P.2d 1194 (Stewart, J., concurring) (citing Mont. Const. art. II, § 16; Wash. Const. art I, § 10 ("Justice in all cases shall be administered openly, and without unnecessary delay.")). Because Utah's framers did not follow limited models like these, "[o]bviously, they did not intend to so limit the rights guaranteed to the citizens of Utah." *Id.*

 ¶ 37 Focusing entirely on the "procedural" content of the language found in section 11, as the State does, is misleading. Constitutional language must be viewed in context, meaning that its history and purpose must be considered in determining its meaning. The language that a remedy shall be had by "due course of law" describes the law by which the remedy is secured, as well as the procedural guarantees also protected by this section. Article I, section 7 already contains a due process provision guaranteeing procedural rights. Thus, if the State's reading of section 11 is correct, section 11 is redundant and mere surplusage—it has no constitutional role or function that is not already performed by section 7. That view has never been embraced by any Utah decision.

¶ 38 This court has always adhered to the view that article I, section 11 imposes some limits on the legislature, a view that former Justice Zimmerman placed in context as follows:

[T]he very act of drafting a constitution such as ours, *which does not bestow unlimited power on the legislature and which does reserve certain rights to the people, constitutes a recognition that there must be some limits on the legislature,* that some interest of the people deserve special

---

8. "A review of the corporation's articles in the original constitutions of other western states shows a consistent pattern: future legislatures were to be prohibited from granting special franchises or advantages, and corporations were to be regulated to avoid price-fixing, monopolies, trusts, or other combinations in restraint of trade." White at 73 & n. 97 (citations to other state constitutions omitted).

9. The last clause, beginning with "except ..." was added by amendment in 1920, to permit the legislature to fix the amount of compensation (for example in the Workmen's Compensation or Industrial Act) for wrongful death, while continuing to prohibit the complete abrogation of the right to recover. *See generally Halling v. Indus. Comm'n of Utah,* 71 Utah 112, 263 P.78 (1927); *Henrie v. Rocky Mountain Packing Corp.,* 113 Utah 415, 196 P.2d 487 (1948).

protection in the maelstrom of interest group politics that is the legislative process.

*Condemarin v. Univ. Hosp.*, 775 P.2d 348, 368 (Utah 1989) (Zimmerman, J., concurring in part) (emphasis added).[10]

¶ 39 That section 11 is redundant should not be assumed. Hans Linde articulated a cogent and compelling distinction between remedies clauses with due process language and "due process of law" provisions like Utah's article I, section 7. The latter, he points out, provide a "prescription ... against *official* deprivations of 'life, liberty, or property,'" and the former are "directed against the denial of a legal remedy to one who has a claim, arising from 'injury done him in his person, property, or reputation' that has its legal source outside [of] this [remedies] section itself." Hans Linde, *Without "Due Process"*, 49 Or. L.Rev. 125, 136 (1970). Linde goes on to observe:

> The two types of guarantees were not confused with each other when the early constitutions were drafted. Other states ... adopted them both and most state constitutions today contain both a 'remedies' clause and a 'due process' ... clause.

*Id.* at 138 (footnote omitted).

¶ 40 Justice Zimmerman's concurring opinion in *Condemarin* further acknowledged and discussed "the wisdom of including article I, section 11's guarantee in Utah's basic charter." *Id.* He explained:

> The constitution's drafters understood that the normal political processes would not always protect the common law rights of all citizens to obtain remedies for injuries. *See Berry*, 717 P.2d at 676; *cf. Developments in the Law: The Interpretation of State Constitutional Rights*, 95 Harv. L.Rev. 1324, 1498–1502 (1982) (protection of majority from politically powerful minorities as an approach to state constitutional interpretation); Note[,] *State Economic Substantive Due Process: A Proposed Approach*, 88 Yale L.J. 1487, 1498 (1979) (perfunctory judicial review is inadequate to protect against special interest legislation).

*Condemarin*, 775 P.2d at 367 (Zimmerman, J., concurring in part). Justice Zimmerman noted that "[i]n declining to so characterize the guarantee of a remedy of injuries [as 'fundamental'], I do not think we intended to denigrate *the importance of the rights protected from legislative abridgement by article I, section 11.*" *Id.* at 366–67 (emphasis added).

2. Substantive Protection Before *Berry*

¶ 41 *Berry* continues a long tradition in Utah's courts limiting the power of the legislature to abrogate remedies. *See Craftsman*, 1999 UT 18, ¶ 64, 974 P.2d 1194 (Stewart, J., concurring). Only one former justice of this court—in an opinion in which no other justice joined—has so far asserted the contrary. *See id.* at ¶ 108 (Zimmerman, J., concurring). The substantive protection found in article I, section 11 has been recognized throughout the history of the state of Utah. In *Brown v. Wightman*, as noted earlier, we held that the open courts provision acts as a protection against the legislature from abrogating legal rights to a remedy for injury. *See* 47 Utah 31, 34, 151 P. 366, 366–67 (1915) (recognizing that open courts provisions are treated "as *placing a limitation upon the Legislature* to prevent that branch of the state government from closing the doors of the courts against any person who has a legal right which is enforceable in accordance with some known remedy" (emphasis added)).

¶ 42 In *Brown* the plaintiff was asking the court to use section 11 as a basis for creating a *new* cause of action where one had not existed previously. *See id.* In denying the plaintiff's request, the court recognized that the open courts clause does not give the court the power to *create* new legal rights. *Id.* That seems to be an unremarkable proposition and one that in no way undermines the function, explicitly acknowledged in *Brown*, of section 11 in limiting the legislature's power to abrogate existing legal rights. *See id.*

¶ 43 The substantive protection acknowledged by this court in *Brown* was again recognized in *Masich v. United States Smelting, Refining & Mining Co.*, 113 Utah 101, 191 P.2d 612 (1948). In *Masich*, discussed at

---

**10.** Justice Zimmerman subsequently changed his mind about article 1, section 11, and urged the court to overturn *Berry* in *Craftsman*. *Crafts-* *man*, 1999 UT 18 at ¶ 108, 974 P.2d at 1224. He was unsuccessful in that effort.

length in Justice Stewart's opinion in *Craftsman, see* 1999 UT 18 at ¶¶ 64, 83–86, 974 P.2d 1194, this court, in determining the constitutionality under section 11 of the Occupational Disease Act, explained that although "certain individual rights and remedies can be made to yield to the public good," "[i]f the legislature were to abolish all compensation and common law rights for negligence of an employer, *no contention could reasonably be made that it was a proper exercise of the police power.*" *Masich,* 113 Utah at 125, 191 P.2d at 624 (emphasis added). Rather, "[t]he reverse would be true and pauperism with its concomitants of vice and crime would flourish." *Id.* Under the State's interpretation of article I, section 11, the legislature would be entirely free to "abolish all compensation and common law rights for negligence of an employer," in the words of the *Masich* opinion, or indeed of any class of potential defendants with pockets deep enough to mount a successful lobbying campaign. Thus, the State's argument rejects the explicit position of the *Masich* court as well as the *Brown* court that section 11's remedy clause contains a limitation on the legislature as well as procedural guarantees affecting the courts. The analysis set forth in *Berry,* by contrast, is completely consistent with *Masich,* and protects Utah citizens in a way that has been obvious to this court since 1915.

¶ 44 Likewise, the plain meaning of the open courts clause as a substantive protection is consistent with our case law since *Masich. See Craftsman,* 1999 UT 18 at ¶¶ 38, 86, 974 P.2d 1194 (Stewart, J., concurring). With the sole exception of Justice Zimmerman's revised view, the meaning of the open courts provision has been unanimously concurred in by every justice sitting on Article I, section 11 cases before this court. *See id.* (noting unanimous concurrence of all thirteen justices of this court from *Masich,* 113 Utah 101, 191 P.2d 612 (1948), to *Hirpa v. IHC Hospitals, Inc.,* 948 P.2d 785 (Utah 1997) (Howe, J., applying *Berry* analysis in unanimous opinion)). This court has continued to apply the *Berry* analysis with absolutely no reservations, other than Justice Zimmerman's recantation of his original views. *See, e.g., Craftsman* at ¶ 15 n. 5, 974 P.2d 1194 (Russon, J.) ("As the analytical framework of the majority opinion suggests, Justice Russon agrees with the interpretation of the open courts clause as set forth by Justice Stewart in his concurring opinion."); *see also Lyon v. Burton,* 2000 UT 19, ¶¶ 82–85, 5 P.3d 616 (following the two-step analysis of *Berry,* where Justice Zimmerman was the only justice criticizing *Berry* ). Furthermore, our reading of article 1, section 11 is not in any way unusual or unique in state constitutional law.[11]

11. One commentator has observed:

Few courts continue to insist that the open courts provision has no application to legislative actions. Most courts have explicitly eschewed this limitation on the scope of their constitutional right to remedy clause or have done so implicitly by considering the merits of constitutional challenges to statutes based on the clause. They recognize that legislatures may, in proper circumstances, alter or abolish common-law rights and remedies; however, they have also held that the open court provision places limits on the legislature's power. William C. Koch, Jr., *Reopening Tennessee's Open Court Clause: A Historical Reconsideration of Article I, Section 12 of the Tennessee Constitution,* 27 U. Mem. L.Rev. 333, 437–38 (1997) (citations omitted).
*See, e.g., Sanborn v. Greenwald,* 39 Conn.App. 289, 664 A.2d 803, 809 (1995) (holding that, while Connecticut's open courts provision will not allow the legislature to eliminate remedies absent strong social policy, the legislature is free to place reasonable restrictions on a cause of action, here finding valid the reduction of a stat-

ute of repose for attorney malpractice from six to three years); *Mitchell v. Moore,* 786 So.2d 521, 526 (Fla.2001) (using the Florida open courts provision to invalidate a statute that effectively denied inmates access to the courts because of the statute's high filing fees); *Neher v. Chartier,* 319 Or. 417, 879 P.2d 156, (1994) (finding a statute granting immunity to public employees for common-law liability in violation of Oregon's open courts provision because the statute abrogated a common-law remedy but did not provide a reasonable alternative, nor did the legislature provide a sufficiently strong social policy for the elimination of the remedy); *Kyllo v. Panzer,* 535 N.W.2d 896 (S.D.1995) (finding a statute that granted immunity to state employees for common-law liability violated South Dakota's open courts provision because the statute abrogated a common-law remedy but did not provide a reasonable alternative, nor did the legislature provide a sufficiently strong social policy for the elimination of the remedy); *Weiner v. Wasson,* 900 S.W.2d 316 (Tex.1995) (holding that a statute of limitations that cut off a minor's cause of action before the minor reaches majority age, the age at which the minor can sue on his or her

3. Stare Decisis

 ¶ 45 Under the doctrine of stare decisis, "[t]hose asking us to overturn prior precedent have a substantial burden of persuasion." *State v. Menzies*, 889 P.2d 393, 398 (Utah 1994). We will not overturn precedent "unless clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent." *Id.* at 399 (quoting John Hanna, *The Role of Precedent in Judicial Decision*, 2 Vill. L.Rev. 367, 367 (1957)). The State has not met its burden.

¶ 46 In *State v. Menzies*, we overruled precedent that had been in place for approximately twenty years. *Menzies*, 889 P.2d at 399. However, we did not do so lightly, and the decision in that case was justified for three reasons that are not applicable here. First, the precedent in *Menzies* was "not the most weighty of precedents." *Id.* The *Berry* rule, however, is based on a constitutional mandate, and on a judicial understanding of it, that has provided substantive protection for the citizens of this state since the earliest days of statehood. Second, the precedent rejected in *Menzies* was established "with little analysis and without reference to authority." *Menzies*, 889 P.2d at 399. *Berry's* analytical model, by contrast, was established only after a thorough analysis of Utah's case law regarding the open courts provision and the case law and history of other states with similar provisions. *See Berry*, 717 P.2d at 674–81. Third, the precedent overruled in *Menzies* did "not work very well." *Menzies*, 889 P.2d at 400. Although the State claims that *Berry* does not work well, our case law since *Berry* indicates that it does. The two-part *Berry* test is a functional method of preserving Article I, section 11's protections while still permitting rational evolution of tort law.

¶ 47 The State has not demonstrated that *Berry* was decided wrongly or that any change in conditions makes the application of *Berry* unsound. Rather than showing that "more good than harm will come by departing from precedent," *Menzies*, 889 P.2d at

399, the result of the State's view can only do harm to our constitution and to the delicate balance of process it creates. The purpose behind the open courts provision is to prevent corporate or other private special interests from unduly influencing the legislature for their own self-interest and at the expense of the public good and the rights of the individual. There has been no change in conditions that would make this any less of a possibility than it was at the time our constitution was drafted or when *Berry* was decided.

¶ 48 The State's argument in effect would remove from Utah's Declaration of Rights any limitation on legislative power to abolish or drastically restrict tort redress. As the dissenting justices observed in *Meech v. Hillhaven West, Inc.*, 238 Mont. 21, 776 P.2d 488 (1989), such a decision would "clean[se] the scalpel for the legislature to cut away unrestrainedly at the whole field of tort redress. Perhaps worse . . ., the Court throws in the sponge as a co-equal in our tripartite state government." *Id.* at 507. The remedies clause of article I, section 11 was thoughtfully included in Utah's Declaration of Rights to ensure that the legislature would not be free to arbitrarily eliminate common law rights without establishing significant social and policy need or providing reasonable alternatives for the protection and vindication of those rights. *Brown, Masich, Berry* and their progeny continue to safeguard this principle.

**B. Application of Berry to Subsection 63–30–2(4)(a)**

 ¶ 49 We now turn to the analysis of the constitutionality of subsection 63–30–2(4)(a) using the test set forth in *Berry*. A legislative enactment that does not eliminate a remedy is not unconstitutional under the open courts provision. *See* Utah Const. art. 1, § 11. Therefore, we must first determine whether a cause of action has been abrogated by the legislative enactment. If no remedy was eliminated, there is no need to proceed with the *Berry* test.

behalf, violates Texas's open courts provision); *cf., Cronin v. Sheldon*, 195 Ariz. 531, 991 P.2d 231, 238–39 (1999) (recognizing that Arizona's open courts provision places substantive restrictions on the legislature's ability to abrogate common-law remedies, but refusing to apply the open courts provision to statutorily created rights).

1. Abrogation of Remedy

 ¶ 50 The State argues in this case that no remedy was abrogated because the 1987 amendment to the Governmental Immunity Act contained in subsection 63–30–2(4)(a) had been enacted four years before Mr. Laney was electrocuted in 1991. The issue under the open courts provision, however, is not whether a statute has already been enacted before a claim arises, but rather whether the statute abrogates a cause of action existing at the time of its enactment.[12] *See Day v. State*, 1999 UT 46, ¶¶ 35–38, 980 P.2d 1171 ("The determination of whether a person who is injured in 'person, property, or reputation' has been denied a remedy by due course of law should be decided by reference to the general law of rights and remedies at the time that the Legislature abrogates a remedy."). Thus, the State's argument that there is no abrogation of a remedy if a statute is already in effect at the time a cause of action arises is inapplicable.

¶ 51 Plaintiffs assert that the 1987 amendment abrogated a remedy because the law in effect prior to the amendment provided individuals negligently injured by municipality-operated power lines with a cause of action against the municipality. Prior to the amendment, the scope of sovereign immunity depended on whether the governmental activity complained of was found to be a "governmental function" or a "proprietary function." Only those activities determined to be governmental functions were afforded immunity. *See Standiford v. Salt Lake City Corp.*, 605 P.2d 1230, 1235 (Utah 1980) ("The general grant of immunity only extends to injuries resulting from 'the exercise of a governmental function....'"). The Act did not define what constituted a governmental function, therefore this court established a standard whereby a function could be considered a governmental function. *See id.* ("Th[e statute's] language gives this Court the power to define understandably and logically the term 'governmental function.'"). In *Standiford*, we held that a governmental function must be "of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity." *Id.* at 1236–37. This definition of the term governmental function was used to determine whether an activity was covered by the Act until the legislature redefined the term in the 1987 amendment.

¶ 52 Plaintiffs argue that the City's operation and maintenance of a municipal electrical power system would not have been a governmental function under the *Standiford* standard because maintaining power lines is not "of such a unique nature that it can only be performed by a governmental agency or that ... is essential to the core of governmental immunity." *Id.* We agree.

¶ 53 Prior to the 1987 amendment, the operation of an electrical power system was considered a proprietary function, which was not entitled to immunity under the Act. *See, e.g., Lehi City v. Meiling*, 87 Utah 237, 48 P.2d 530, 546 (1935) (Wolfe, J., concurring)("[T]he supplying of water, light, and gas were considered as commodities and subjects of commerce and were performed almost altogether in the beginning by private corporations."); *Egelhoff v. Ogden City*, 71 Utah 511, 516, 267 P. 1011, 1012 (Utah 1928) ("A municipality which supplies water to its citizens, and charges therefor, is liable for negligence ...." (quoting McQuillin, Mun. Corps. § 2880, 5514)); Note, *Defining Governmental Function Under the Utah Governmental Immunity Act*, 9 J. Contemp. L. 193, 195, n. 10 (1983) ("[T]he supplying of water, light and gas were considered subjects of commerce and had historically been performed by private corporations."). Under the 1987 amendment, however, a claim against a municipality for negligent maintenance of power lines can be barred by the scope of immunity protection afforded the City. Although the Act waives immunity for governmental functions if there is negligence involved, *see* § 63–30–10, a plaintiff suing a municipality is now subject to the exceptions

---

12. Although Utah courts have in the past looked to the common law at the time of statehood to determine whether a remedy has been abrogated, we reiterate that this is not the proper question. *See, e.g., Day v. State*, 1999 UT 46, ¶ 35, 980 P.2d 1171 ("[T]he rights protected by Article I, section 11 are not defined by those causes of action that existed in 1896."). Although the state of the law at the time of statehood may have some bearing on the issue, it is not the determining factor. *See id.*

to the waiver of immunity, *see, e.g.,* § 63–30–10(1) to (19). By defining a governmental function as *any* act of a governmental entity, whether or not the activity is characterized as governmental or proprietary, the 1987 amendment effectively grants immunity protection for some activities that were formerly considered proprietary and were not entitled to immunity. Therefore, we find that the 1987 amendment partially abrogated a remedy for a municipality's negligence. Because a remedy has been abrogated, we proceed with the *Berry* test to determine the constitutionality of the amendment under the open courts provision.

2. No Reasonable Alternative Remedy

¶ 54 Under the first prong of the *Berry* analysis, when a remedy has been abrogated, this court first determines whether the legislature has provided a "reasonable alternative remedy 'by due course of law' for vindication of [a plaintiff's] constitutional interest." *Berry,* 717 P.2d at 680. In *Berry,* we held that the substitute benefit "must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different. . . ." *Id.* In the instant case, we find no indication that the legislature provided any substitute remedy, nor does the State make this argument. Therefore, we must turn to the second prong of the *Berry* test.

3. Elimination of Clear Social or Economic Evil

¶ 55 The State contends that even if a remedy was abrogated, the amendment is constitutional under the second prong of the *Berry* test, which provides that where no alternative remedy has been provided, "abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective." *Id.*

¶ 56 To determine whether the legislature was justified in abrogating the remedy for negligence of a municipality, we review legislative history of the 1987 amendment "to determine the reason for its enactment and whether the abrogation was 'an arbitrary or unreasonable means for achieving' the elimination of a 'clear social or economic evil.'" *Day v. State,* 1999 UT 46, ¶ 44, 980 P.2d 1171 (quoting *Berry,* 717 P.2d at 680). In a number of cases we have examined whether in abolishing a remedy the legislature identified a clear social or economic evil, and then employed reasonable means to eliminate the evil.

¶ 57 In *Hirpa v. IHC Hospitals, Inc.,* 948 P.2d at 793, this court held that Utah's Good Samaritan Act, Utah Code Ann. § 58–12–23 (1996), met the second step of Berry's two-step analysis. *Id.* at 793. The analysis in *Hirpa* assumed that prior to the Good Samaritan Act's passage, the common law rule that a physician who is under no affirmative duty to assist a person in distress is held to a duty of due care if he or she chooses to respond and render voluntary emergency assistance, applied. *Id.* at 793. We held that the Good Samaritan Act did not violate the open courts provision by displacing the common law rule because the legislature legitimately characterized the common law rule as a social evil by discouraging physicians from responding to emergencies and rendering medical care in life threatening situations. *Id.* at 793–94. *Hirpa* took particular notice of the manner in which the legislature sought to accomplish its goal. The opinion stressed that the provisions of the Good Samaritan Act were narrowly tailored. *Id.* at 794. Only good faith providers were immunized. *Id.* The immunity applied only to physicians rendering emergency care and not to care after the emergency had ended. *Id.* The court continued:

Finally, as we have interpreted the act, it applies only to medical doctors who had no preexisting duty to render aid. Thus, the act immunizes only true volunteers who render aid even though they are not obligated to do so. We think these limitations indicate the reasonableness of the act. The statute does not cut an unnecessarily wide swath through causes of action against medical providers. Rather, immunity is provided under limited circumstances and only for the purpose of encouraging potentially life-saving emergency

medical care. Therefore, we think the act is a reasonable attempt to eliminate a clear social evil and does not violate article I, section 11 of the Utah Constitution.

*Id.*

¶ 58 In *Cruz v. Wright,* 765 P.2d 869 (Utah 1988), we similarly considered whether the Married Women's Act of 1898 violated article I, section 11. We assumed that prior to the passage of the Married Women's Act, the common law rule applied allowing a husband a cause of action for loss of consortium against a third party who negligently injured his wife. The Married Women's Act, as interpreted by this court, eliminated the husband's remedy. We stressed that under the *Berry* test, the legislature may eliminate or abrogate a cause of action entirely if there is sufficient reason and the elimination or abrogation is not an arbitrary or unreasonable means of achieving the objective. We wrote:

> Therefore, even if a loss-of-consortium cause of action did exist at common law in Utah (and there is no evidence that such an action did exist), that would not prevent the legislature from modifying or abolishing that cause of action if necessary to serve sufficiently strong legislative ends. Having considered the question, we conclude that the passage of the Married Women's Act was a reasonable legislative enactment intended and reasonably tailored to place men and women on equal footing with respect to their ability to bring actions for their own injuries and to extinguish the concept that a wife was the property of her husband. If, in the process, the husband's right to sue for loss of his wife's consortium, which may have never existed in Utah, was abolished, we conclude that the abolition was not an unreasonable step.

*Cruz,* 765 P.2d at 871 (citations and footnote omitted).

¶ 59 Cases involving statutes of limitation and statutes of repose have come before this court with mixed results. In an early case, we held that article I, section 11, did not preclude the legislature from prescribing a one-year statute of limitations for the time within which to assail the regularity or organization of an irrigation district. *Horn v. Shaffer,* 47 Utah 55, 151 P. 555 (1915). In three cases, statutes of repose were struck down because they barred actions without regard to the occurrence of an injury and did not provide a reasonable amount of time to file a lawsuit. No effective and reasonable alternative was provided, and the abrogation of the remedy was held to be arbitrary and unreasonable. *Horton v. Goldminer's Daughter,* 785 P.2d 1087 (Utah 1989); *Sun Valley Water Beds of Utah, Inc. v. Herm Hughes & Son,* 782 P.2d 188 (Utah 1989); *Berry v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985).

¶ 60 The Legislature responded to the constitutional requirements outlined in the foregoing cases by enacting a new statute of repose, considered by this court in *Craftsman Builder's Supply v. Butler Manufacturing,* 1999 UT 18, 974 P.2d 1194. In that case, we upheld a statute of repose barring actions against builders after twelve years against an article I, section 11 attack. We held that given the clear social and economic evils identified by the legislature in enacting the statute of repose together with the remote chance of injury or damage after a period of twelve years, the statute was not an arbitrary or unreasonable means of eliminating the stated evils and was constitutional. In summary, in all of the foregoing cases in which the legislation or legal rule under examination passed constitutional muster under the second prong of the *Berry* test, the abrogation of the remedy was not an "arbitrary or unreasonable means for achieving" the elimination of a clear social or economic evil. *Berry,* 717 P.2d at 680.

¶ 61 In the only case that we have found which did *not* involve an act of the legislature, this court abolished the common law tort of criminal conversation and justified its abolition under the open courts provision on the ground that the cause of action was "unfair and bad policy," "serve[d]" no useful purpose, was subject to abuse, and protected interests that were already adequately served by the tort of alienation of affections. *Norton v. Macfarlane,* 818 P.2d 8, 16–17 (Utah 1991).

¶ 62 Recently, in *Day v. State,* 1999 UT 46, 980 P.2d 1171, we relied on the open courts provision to strike down a statute granting immunity for negligent operation of an emer-

gency vehicle in circumstances where immunity had not previously existed. We declared the statute unconstitutional because the legislature was not acting to obviate a "clear social evil" in this state. *Id.* at ¶ 46 (citation omitted). The sponsor of the legislation had explained that the statute was necessary because of a rash of frivolous lawsuits, "especially in California." *Id.* We noted that on its face, the sponsor's statement did not identify any social, economic, or any other evil in Utah. No evidence was presented that Utah had experienced a rash of similar lawsuits, or was likely to. *Id.*

¶ 63 In another case, *Lee v. Gaufin,* 867 P.2d 572, 589 (Utah 1993), three members of this court struck down a statute of repose for minors in medical malpractice cases under article I, section 24, the uniform operation of laws provision. The remaining justices concurred in the result on the ground that the statute violated article I, section 11. *Id.* at 590 (Zimmerman, J., and Hall, C.J., concurring.) The statute at issue required a minor to bring an action within two to four years after an alleged malpractice injury. *Id.* at 574–75. However, since a minor has no legal and ordinarily no actual ability to bring an action, the net effect of the statute was to deprive the minor of the cause of action before the minor was legally entitled to assert it. *Id.* at 578. The two-judge concurrence states:

> [T]he legislation's supporters have not carried their burden of proof. As the majority opinion demonstrates, the justifications advanced for the legislature's severe abridgment of the right of this narrow category of potential plaintiffs to bring their actions for actual injuries suffered are speculative, to put it charitably. The defenders of this legislation certainly have not shown that the effective elimination of the minor's legal right to sue for medical malpractice is a reasonable, nonarbitrary means for lowering medical malpractice premiums in Utah. Absent such a showing, they have failed to rebut the presumption of unconstitutionality that attaches to legislation that so severely limits a common

law right of action protected by article I, section 11.

*Id.* at 592.

¶ 64 With that backdrop of the history of cases where we have applied the second prong of the *Berry* test, we turn to the instant case. At the outset, we call attention to the strong words of caution in *Brigham v. Moon Lake Electric Ass'n,* 24 Utah 2d 292, 470 P.2d 393 (1970):

> A high tension transmission wire is one of the most dangerous things known to man. Not only is the current deadly, but the danger is hidden away in an innocent looking wire ready at all times to kill or injure anyone who touches it or comes too near to it. For the average citizen there is no way of knowing whether the wire is harmless or lethal until it is too late to do anything about it. Therefore, *a high degree of duty is upon one who transmits electricity in high tension wires* to see that no harm befalls a person rightfully in proximity thereto when that person is himself guilty of no wrongdoing. In other words, *the highest degree of care* must be used to prevent harm from coming to others.

*Id.* at 395 (emphasis added). The 1987 amendment of section 63–30–2(4)(a) eliminates the appellants' right to sue for Mr. Laney's wrongful death. The statutory amendment thus sharply limited instances where municipalities operating a power system could be held liable for their negligence.

¶ 65 As we have done in prior cases, we examine the legislature's purpose in curtailing the previously existing remedy for the negligent operation of a municipal power system. The 1987 amendment was proposed by the Governmental Immunity Task Force of the legislature. The Task Force specifically found:

> In the past several years, lawsuits naming governmental entities as defendants have increased dramatically. The large damage awards against governmental entities that plaintiffs have obtained in these lawsuits has made it increasingly difficult for government entities to obtain or afford liability insurance. . . . If a government entity does not have liability insurance, and a court orders the entity to pay damages,

the entity would need to pay the award by taking money from its general fund.

*See* John L. Fellows, Memorandum to Members of the State and Local Affairs Interim Committee, at 1 (Sept. 4, 1986) (on file with the State of Utah Office of Legislative Research and General Counsel).

¶ 66 According to the legislative history, the task force proposed the 1987 amendment in the "hope that passage of these bills will make it easier or cheaper for a government entity to obtain liability insurance." *Id.* Thus the legislative objective appears to have been to make liability insurance more affordable for government entities by reducing liability risks. While that objective is worthy, the legislature swept too broadly when it severely curtailed negligence actions against municipalities operating power systems. The amendment partially abrogated the remedy of persons injured by a breach of the high duty of care imposed on such operators. The legislative concern about increased damage awards against governmental entities is stated in very general terms; no specifics are given. We do not know whether any municipality in this state operating an electrical system has sustained a large damage award. We do know that only a small fraction operate municipal power systems. The general nature of the legislative findings do not show that large damage awards have been made against municipalities in connection with their operation of an electrical power system, or that such operation has been affected in any way by potential liability.

¶ 67 The City generates an annual profit operating its electrical power system. It is not an operation subsidized by tax dollars. The cost of liability insurance, therefore, might not even be paid for by the taxpayers of the City, but rather by consumers of the electrical power, some of whom may live outside the City. Obtaining liability insurance is one of the costs of a power plant doing business, whether it is a private or municipal power system. If the City cannot afford to purchase reasonable amounts of liability insurance to meet its high standard of care, rate increases may be justified and necessary.

¶ 68 Equally disturbing is the broad sweep that the legislature took to meet its objective. In *Hirpa v. IHC Hospitals, Inc.,* 948 P.2d 785, this court emphasized the narrow tailoring of the Good Samaritan Act in upholding its constitutionality. *Id.* at 794. We noted that only good faith providers were immunized. *Id.* The immunity applied only during the emergency and not after the emergency had ended. *Id.* Additionally, it applied only to medical doctors who had no preexisting duty to render aid. *Id.* We commented:

> We think these limitations indicate the reasonableness of the act. The statute does not cut an unnecessarily wide swath through causes of action against medical providers. Rather, immunity is provided under limited circumstances and only for the purpose of encouraging potentially lifesaving emergency medical care. Therefore, we think the act is a reasonable attempt to eliminate a clear social evil and does not violate article I, section 11 of the Utah Constitution.

*Id.*

¶ 69 In the instant case, the legislature has defined *all* activities of municipalities as governmental action, regardless of their nature. In its sweep, the operation of both a sewer system and a golf course is governmental, along with the operation of a municipal electrical power system, even though the potential for negligently causing death by the municipality is vastly greater in the latter activity and the standard of care is thus much higher.

¶ 70 If large verdicts are vexatious to cities, a reasonable approach might be to create very limited immunities to address specific problems, or to place "caps" on the amount of damages, as the legislature has done elsewhere in the Governmental Immunity Act. Utah Code Ann. § 63–30–34 (Supp.2001). This court has, for example, upheld statutory caps on judgments for damages for personal injury against a governmental entity. *McCorvey v. Utah DOT,* 868 P.2d 41, 48 (Utah 1993). The immunization of all municipal activities was not justified by any legislative investigation, findings, or relevant history.

¶ 71 We therefore hold that the 1987 amendment is unconstitutional as it applies

to municipalities operating electrical power systems. The amendment fails to meet the second prong of the *Berry* test. No clear social or economic evil has been specifically identified, and the broad sweep of the amendment is arbitrary and unreasonable when applied to the operation of a municipal electrical power system, where a high duty of care is imposed. We express no opinion on the constitutionality of the amendment as applied to other municipal activities since a lower standard of care may apply and different considerations may be relevant.

## CONCLUSION

¶ 72 We hold that the acts, omissions, or decisions of the City not to raise the height of, insulate, or provide further warnings on its power lines fall within the discretionary function exception of the Utah Governmental Immunity Act, Utah Code Ann. § 63–30–10. We also hold that Utah Code Ann. § 63–30–2(4)(a), under a *Berry* analysis, violates Article I, section 11, the open courts clause, of the Utah Constitution. We thus reverse the trial court's summary judgment and remand for a trial on the merits of appellants' claims.

¶ 73 Justice HOWE concurs in Chief Justice DURHAM's opinion.

RUSSON, Justice, concurring:

¶ 74 I concur, but for different reasons than stated by Chief Justice Durham. The Chief Justice seems to accept that the legislature can, by statute, declare activities previously held to be proprietary to be governmental if that statute meets the *Berry* test. I disagree. In my opinion, the legislature cannot declare that which is proprietary to be governmental. While the legislature can pass laws affecting "governmental activities" as well as "proprietary activities," it cannot change the true nature of such activities. The operation of a golf course, farm, or store will always be proprietary regardless of what the legislature says it is. The legislature can pass laws pertaining to the operation of automobiles, but cannot declare automobiles to henceforth be sailboats or houses. "Governmental functions" differ in nature from "proprietary functions." While each may be affected by legislation, one cannot be declared to be the other.

¶ 75 Government entities perform governmental functions, and sometimes proprietary functions. Governmental functions are those functions that can be performed only by government. In performing such functions, government entities enjoy absolute immunity from liability. They cannot be sued, even where such activities are negligently performed, unless they so consent. Indeed, the legislature enacted the Utah Governmental Immunity Act, which waives immunity in certain enumerated situations, subject to conditions. And the legislature can, at any time, withdraw such waiver of immunity or modify the same, and do so without meeting the requirements set forth by the *Berry* test. The test set forth in *Berry* does not apply to governmental immunity cases. Governmental immunity applies when core governmental functions are involved.

¶ 76 On the other hand, government occasionally becomes involved in activities that are not governmental in nature but, rather, are proprietary. Such functions are those normally performed by private persons or businesses. When performing proprietary functions, the government does not enjoy governmental immunity. It is subject to the same risks and standards that govern private persons or businesses. Whenever government moves beyond its core functions into the proprietary realm, it enters into direct competition with, and in certain instances, even supplants, private enterprise. In certain instances, government is at a decided advantage when it competes with private entities in the private sector, because the government's cost of doing business does not include the cost of insurance or adverse litigation awards and because government is subsidized by the captive taxpayer base. On the other hand, private businesses often incur not inconsequential costs through the necessity of carrying insurance and defending against litigation, because they are not afforded the same protections or immunity as the government.

¶ 77 If government chooses to engage in proprietary activities, it must do so on the same basis as private persons. It has been long established that government, when performing proprietary functions, is liable for its

actions. The cases brought before this court for decades have required a determination of whether the government entity involved was performing a governmental function for which it could not be° sued or a proprietary function for which it could be sued.

¶ 78 The right of the people to seek a remedy for harm against persons, private entities, or government when performing private or proprietary functions is guaranteed by article I, section 11 of the Utah Constitution. Such right, however, does not exist against a government agency involved in core governmental activities unless, of course, immunity has been expressly waived.

¶ 79 However, the legislature does have power, in certain limited circumstances, to limit or even eliminate the right of persons seeking a remedy against those who have harmed them, including a government entity when acting in a proprietary manner, if such legislation meets the *Berry* test. The *Berry* test applies to legislative acts that would restrict or eliminate the right of the people to seek a remedy under the open courts provision of the Utah Constitution against a person, business, or government entity participating in a private or proprietary action that allegedly harmed them.

¶ 80 In the case before us, the amended statute in question declares any act of government, even a proprietary act, to be a governmental function, thereby enjoying absolutely immunity from liability. In other words, under this act, a government entity can own and operate a golf course, an amusement park, a ski resort, a farm, a retail store, or other such private business and not be liable for negligently doing so. It can compete in the market place with private persons or businesses but not be legally responsible for its harms. This is an abandonment of long-held legal, economic, and political principles fundamental to our way of life. When government participates in the private proprietary sphere, it is subject to the open courts clause of the Utah Constitution just as are those with whom the government is competing.

¶ 81 The operation of a power plant by a government entity is proprietary. This status cannot be changed by the legislature. What the legislature can do, however, is pass legislation modifying, restricting, or eliminating the right of people to seek a remedy against private persons, or a government entity, operating a power plant, but such legislation must meet the *Berry* test.

¶ 82 Therefore, in the case before us, Fairview City was acting in a private or proprietary function in its operation of an electrical power plant for which it was subject to liability for negligence, if any, and the amendment to the statute did not change, nor could it change, this status. Furthermore, the amendment to the statute did not purport to affect the City's liability for operation of the power plant as a proprietary function, but even if it did, it failed to meet the *Berry* test.

¶ 83 For the above reasons, I concur that the 1987 amendment is unconstitutional as it applies to municipalities operating electrical power systems and violates article I, section 11 of the open courts clause of the Utah Constitution. The case must therefore be reversed and remanded to the trial court for trial on the merits of appellant's claims.

WILKINS, Justice, concurring and dissenting:

¶ 84 I concur with nearly all of section I of the lead opinion, the well-reasoned discretionary function analysis. I state no opinion, however, as to whether compliance with industry standards is necessary for an act or omission of a municipality to constitute a discretionary function, *see supra* ¶¶ 24–25, as I deem it unnecessary to the analysis.

¶ 85 I dissent, however, with section II of the lead opinion, the majority's interpretation of the Open Courts Clause. In my view the current interpretation of the Open Courts Clause originating with *Berry ex rel. Berry v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985), and the accompanying *Berry* test, places this court outside of its constitutional role and creates separation of powers problems. I would overturn *Berry* in favor of the more procedural interpretation of the Open Courts Clause advanced in our jurisprudence prior to, and since, *Berry.* I also disagree with Justice Russon's concurring opinion, as he also declares the section 63–30–2(4)(a) unconstitutional and continues to adhere to *Berry.*

¶ 86 In my opinion, section 63–30–2(4)(a) of the Utah Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 to –38 (1997 & Supp. 2000), does not violate article I, section 11, of the Utah Constitution, the Open Courts Clause. I would therefore affirm the district court's ruling that Fairview City is immune from suit for the alleged negligence. In my view, the Legislature acted within its constitutional authority in setting forth the current scheme of sovereign immunity in Utah. Under the statute, Fairview City should be entitled to immunity for its omissions, to not raise the height of, insulate, or provide further warnings on its power lines under section 63–30–10, a discretionary function within the discretionary function exception of the Utah Governmental Immunity Act.

¶ 87 Fairview City correctly argued that this Court must presume section 63–30–2(4)(a) is constitutional, resolving any reasonable doubts in favor of constitutionality. As this court stated in a prior Open Courts case:

The first and foundational [principle of law relating to the constitutionality of statutes] is that the prerogative of the legislature as the creators of the law is to be respected. Consequently, its enactments are accorded a presumption of validity; and this court should not strike down a legislative act unless the interests of justice in the particular case before it require doing so because the act is clearly in conflict with the higher law as set forth in the Constitution.

*Zamora v. Draper*, 635 P.2d 78, 80 (Utah 1981) (internal footnote citations omitted); *see also Utah Sch. Bds. Ass'n v. State Bd. of Educ.*, 2001 UT 2, ¶ 9, 17 P.3d 1125; *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 920 (Utah 1993); *Lindon City v. Engineers Const. Co.*, 636 P.2d 1070, 1073 (Utah 1981).

¶ 88 In the recent past, since 1985, the Open Courts Clause has been interpreted in such a way that it limits the legislature's ability to alter, modify, or eliminate the law by requiring legislation to meet this court's approval through the *Berry* test. *See, e.g., Berry*, 717 P.2d at 676, 680. In *Berry*, prior members of this court admittedly "broke new ground and read article I, section 11 … as imposing a strong substantive limitation on the legislature's ability to limit or eliminate a cause of action for, or the remedies available

for [personal injury]." *Craftsman Builder's Supply, Inc. v. Butler Manuf. Co.*, 1999 UT 18, ¶ 112, 974 P.2d 1194; *accord Berry*, 717 P.2d at 676, 680–81. In order to ensure that the legislature was appropriately limited, or, in my view, to permit the court to pass judgment on legislative policy, this court developed the *Berry* analytical model. Again, in order for a statute that abrogates an existing remedy to withstand a constitutional challenge under the Open Courts Clause, *Berry* requires one of two conditions to be met:

First, … the law [must otherwise provide] an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interest. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different … [; or]

[s]econd, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Berry*, 717 P.2d at 680 (citations omitted).

¶ 89 In my view, this test permits a majority of this court to substitute its judgment of what constitutes good public policy for the judgment of the legislature, the branch of government that is not only best suited to determine and implement public policy under our system of government, but constitutionally obligated to do so. *See* Utah Const. art. VI, § 1. I am of the opinion that whether a substitute remedy is of "substantially equal value or other benefit to the remedy abrogated," and whether there is a clear social or economic evil to be eliminated, are two questions that should be answered by the legislature, not this court, and that we overstep our bounds in so doing. In my view, application of the *Berry* queries to a set of facts can result in a decision either in favor of, or

opposed to, the legislation, and the decision depends completely upon one's opinion of what is in the public good. This case demonstrates why the *Berry* test is a straw man analytical framework that permits one to justify a predetermined outcome. To borrow Justice Zimmerman's language, it is "subject to manipulation." *Craftsman,* 1999 UT 18 at ¶ 108, 974 P.2d 1194.

¶ 90 How one answers the first *Berry* query, whether the act provides an effective and reasonable alternative remedy equal in value or other benefit to the abrogated legal remedy, depends upon one's point of view. From the plaintiffs' perspective, the 1987 amendment including section 63–30–2(4)(a) eliminated their possible remedy; they can no longer recover for wrongful death because the legislation abrogated their right to sue for wrongful death without offering any substitute remedy, let alone an effective, reasonable, alternative one. To them, the amendment precludes recovery. From the plaintiffs' point of view, prior to the date on which section 63–30–2(4)(a) became effective, they would have had a remedy against Fairview City for Mr. Laney's death as the City's operation of the power lines was, to them, a proprietary function; but now, because section 63–30–2(4)(a) broadly defines governmental function to encompass the operation of power lines, they no longer have a remedy of any sort against the City.[13] From Fairview City's perspective, on the other hand, section 63–30–2(4)(a) did not abrogate an existing remedy, and, therefore, the legislature did not need to provide an adequate alternative remedy. In Fairview City's view, at the time section 63–30–2(4)(a) was enacted, the doctrine of sovereign immunity provided that no remedy against the City existed without the legislature's permission. The legislature dictates under what circumstances sovereign immunity is waived and recovery is permitted against the State; and therefore where no remedy is guaranteed, modification does not abrogate a remedy. The City reasons that the Act did not abrogate a remedy because sovereign immunity as it existed at the time of statehood would have prevented the plaintiffs from recovering against Fairview City. Even looking to whether the amendment abrogated a cause of action existing at

the time of its enactment, a cause of action exists against the state only as the legislature sees fit to waive immunity. In my view, both positions are rational. It is only after one inserts his or her view as to what the law should be, in this case how sovereign immunity functions, that one determines whether the amendment permits an adequate and reasonable alternative remedy. If one agrees that the legislature has authority to waive sovereign immunity, the legislature does not abrogate a remedy. If one believes that injured individuals are entitled to a remedy from state funds, then legislation that prevents this abrogates a remedy.

¶ 91 The second part of the *Berry* test permits one to second-guess legislation and justify a predetermined outcome even more so than the first part. Whether, if no adequate substitute or alternative remedy is provided, the act remedies a clear social or economic evil, clearly depends upon one's point of view. In my view, this court has no business passing judgment on what constitutes a clear social or economic evil in this manner. Then, analyzing whether legislation is a reasonable or nonarbitrary means of eliminating such a perceived social or economic evil simply permits one to decide constitutionality based upon his or her personal opinion regarding legislative policy. From the plaintiffs' perspective, the legislature did not identify any social or economic evils to be eliminated, and therefore this second prong of *Berry* is not met. Arguably, from the plaintiffs' position, it is a clear social or economic evil to prohibit recovery against the State for personal injury; and the 1987 amendment eliminating such recovery is an arbitrary, unreasonable elimination of what should be remedied. From Fairview City's perspective, on the other hand, the legislature identified clear social and economic evils, which it eliminated through non-arbitrary, reasonable legislation. Specifically, the legislature viewed high insurance expenses borne by municipalities, potential burdens on the tax base of governmental entities, and the unpredictability for municipal risk managers, as clear economic evils. It reduced these economic evils through re-

---

**13.** Utah Code Ann. § 63–30–2(4)(a) was added to the Utah Governmental Immunity Act in 1987.

structuring the circumstances under which recovery against the State for personal injury is permitted. Nevertheless, in my view, this court has no business deciding what constitutes a clear social or economic evil in this way. Permitting this court to do so, and then requiring this court to determine whether the perceived social or economic evil was eliminated in an unreasonable, non-arbitrary way, requires this court to sit as a second legislature, reevaluating public policy of already-debated legislation.

¶ 92 While other cases may, and certainly will, more clearly reveal reasonable positions on either side of the *Berry* framework, the fact remains that the *Berry* test permits reasonable conclusions on either side. In my view, the *Berry* test simply sets forth a framework for justifying the policy position of a majority of the members of this court. The test is a vehicle for re-arguing the competing policies that the legislature already had before it—rightfully so as the people's representatives—in debating and enacting the legislation. It requires judges to determine whether a substitute remedy is adequate, and debate again the competing social and economic evils connected with the legislation. For me, this reveals the disguise of the *Berry* test: it functions as a vehicle for judicial legislation and it permits members of the judiciary to justify through a straw man legal analysis, a politically-based, and potentially predetermined, outcome.

¶ 93 In my opinion, our case law following *Berry* reveals the problems created by *Berry*. Clearly, the members of this court, past and present, do not agree that *Berry* is the best method for analyzing Open Courts challenges. Justice Zimmerman, an initial *Berry* proponent, reluctantly reached the conclusion that the *Berry* interpretation of the Open Courts Clause and its progeny do not provide a workable analytical framework. *See, e.g., Lyon v. Burton,* 2000 UT 19, ¶¶ 85–92, 5 P.3d 616 (Zimmerman, J., concurring in the result); *Craftsman Builder's Supply, Inc. v. Butler Manuf. Co.,* 1999 UT 18, ¶¶ 108–155, 974 P.2d 1194 (Zimmerman, J., concurring in the result). I agree. I would abandon *Berry* and its progeny and return to the prior interpretation suggested by this court, particularly the interpretation suggested by Justice Crockett, for addressing challenges based on

the Open Courts Clause. I disagree with the lead opinion's claim that, prior to *Berry,* the Open Courts Clause was interpreted as a substantive guarantee to a remedy, and that it has been "unanimously concurred in."

¶ 94 I do not disavow *Berry* lightly. I am cognizant of and respect the principle of stare decisis, which gives stability and predictability to our legal system. *See Clark v. Clark,* 2001 UT 44, ¶¶ 25–29, 27 P.3d 538 (Wilkins, J., concurring). However, "[t]his court has 'not hesitated ... to reverse case law when we are firmly convinced that we have erred earlier.'" *Clark v. Clark,* 2001 UT 44, ¶ 32 n. 3, 27 P.3d 538 (quoting *Staker v. Ainsworth,* 785 P.2d 417, 424 n. 5 (Utah 1990)) (Russon, A.C.J., dissenting, joined by Howe, C.J.). I agree that "we should not perpetuate a law that is clearly wrong for the sake of stare decisis." *Clark v. Clark,* 2001 UT 44, ¶ 32 n. 3, 27 P.3d 538. (Russon, A.C.J., dissenting, joined by Howe, C.J.). I am firmly convinced that the *Berry* interpretation of the Open Courts Clause is erroneous; the accompanying *Berry* test has proven to create more problems than it has solved. Compelling to me is that *Berry* has proven to be unworkable over a period of 17 years, has not been adhered to unanimously, has been questioned and chastised by members of this court, including one who agreed with the *Berry* interpretation initially, has been criticized by legal scholars, and presents separation of powers problems. It is my view that we should return to the more procedural interpretation of the Open Courts Clause and abolish the *Berry* test rather than persist in the quagmire of decisions generated by *Berry* that have permitted this court to reevaluate legislative policy, thereby placing the judiciary in a legislative role, a role inconsistent with our constitutional authority.

¶ 95 *Berry* has been the subject of criticism. Indeed, our cases since *Berry* demonstrate that this criticism has proven to be well-founded. The substantive interest recognized in *Berry* has led to a morass of case law. *See, e.g., Craftsman,* 1999 UT 18 at ¶ 136, 974 P.2d 1194 (Zimmerman, J., concurring in the result) (discussing the evolution of the *Berry* test and its progeny). The ana-

lytical model developed in *Berry* has been described by an initial proponent, Justice Zimmerman, as "unworkable" because it is "subject to manipulation, . . . leads to absurd results, and it distorts [the judiciary's] relationship with the legislature." *Id.* at ¶ 108, 974 P.2d 1194; *see also Lyon*, 2000 UT 19 at ¶ 89, 5 P.3d 616. As is explained later, former members of this court have interpreted the Open Courts Clause differently, contrary to the *Berry* interpretation. Furthermore, *Berry* was also criticized by scholars even before its progeny developed. *See, e.g.,* John H. Bauman, *Remedies Provisions in State Constitutions and the Proper Role of the State Courts,* 26 Wake Forest L.Rev. 237, 270–71 (1991) (describing *Berry* as "typical of the activist use of the remedies provision" and criticizing *Berry* for infringing on the policy-making role of the legislature); David Schuman, *The Right to a Remedy,* 65 Temp. L.Rev. 1197, 1215–17 (1992) (discussing the "complex methodology" of *Berry* and stating that "[n]one of the existing solutions to the remedy clause problem is completely satisfactory.").

¶ 96 Upon further contemplation, and with the benefit of hindsight, I am persuaded that the assumptions upon which *Berry* was based are, in part, faulty. As far as I can tell, *Berry* is premised on the following:

> [T]he basic purpose of Article I, section 11 is to impose some limitation on that power [the power of the legislature to define, change, and modernize the law] for the benefit of those persons who are injured in their persons, property, or reputations since they are generally isolated in society, belong to no identifiable group, and rarely are able to rally the political process to their aid.

*Berry*, 717 P.2d at 676, *quoted in Condemarin v. Univ. Hosp.,* 775 P.2d 348, 357 (Utah 1989); *see also Sun Valley Water Beds of Utah, Inc. v. Herm Hughes & Son, Inc.,* 782 P.2d 188, 191 (Utah 1989); *Lyon,* 2000 UT 19 at ¶ 29, 5 P.3d 616 ("By and large, persons who suffer serious personal or property injuries are an isolated and unidentifiable minority who have little influence on legislative actions. These considerations were instrumental in the adoption of the open courts clauses in a number of state constitutions."); Schuman, *supra,* at 1217 (stating that to permit the legislature to eliminate remedies at will runs the risk of majoritarian abuse).

¶ 97 As I mentioned previously, I agree that the Open Courts Clause limits legislative authority. Numerous constitutional provisions prevent the legislative branch from eliminating constitutional or inalienable rights. I do not think, however, that the Open Courts Clause guarantees one the right to a judicial remedy for every injury done to one's person, property, or reputation. The Open Courts Clause should not be interpreted as it is now; the *Berry* interpretation inappropriately, and as I see it, unconstitutionally, limits legislative authority to alter, change, and modernize the law.

¶ 98 The first *Berry* assumption with which I disagree is the assumption that those who suffer because of legislation preventing recovery for personal injury are individuals who are somehow part of a minority that is not represented or underrepresented in the political process. In my view, individuals who suffer injury to their person, property, or reputation are not a discreet and insular minority. All persons, regardless of ethnic background, economic background, gender, religious persuasion, or other affiliations, may suffer injury. Viewing an injured individual or group retrospectively, after they have suffered injury, they may very well be unable to rally the political process. Prospectively, however, all of us as citizens, regardless of status, are subject to legislation limiting our ability to recover for personal injury. No group is singled out by legislation that limits the ability to recover for personal injuries. All citizens face the possibility of personal injury, even those who are generally visible in society that belong to what we may think are privileged, identifiable groups. Some individuals or groups may be more or less able than others to rally the political process to their aid. Those who suffer injury to their person, property, or reputation, are not a distinct group who are without the ability to rally political support, however. Those thwarted by the Utah Governmental Immunity Act, those who have suffered personal injuries at the hands of the government, may be any of us; they do not comprise a distinct and insular group whose voice may not be heard through the political

process. Rather, this "minority" is simply a random subset of the population as a whole. No group is singled out. All citizens—even legislators themselves—are subject to the possible harsh ramifications of sovereign immunity, and certainly their voices are heard through the political process.

¶ 99 Second, *Berry* assumes that the Open Courts Clause contains language which should be interpreted to protect against majoritarian abuse. I disagree. Other provisions in our constitution are more suited to protecting against majoritarian abuse. They contain language which more specifically implies protection for political minorities, and these provisions have also been interpreted to protect groups and individuals that are isolated from the political process. In my opinion, the language of the Open Courts Clause is ill-suited to protect against majoritarian abuse. I doubt that the founders of our State Constitution intended that this clause prevent the legislature from modifying the law without this court passing judgment on whether an alternate remedy is adequate or whether the legislative judgment as to whether a social or economic evil was addressed was sound. The Open Courts Clause protects against legislative action that would limit or hinder the courts from serving the people by doing anything less than properly and efficiently assist in resolving disputes and performing other judicial functions.

¶ 100 I believe it is misleading to aver that construing the Open Courts Clause as I propose presents a significant danger of majoritarian abuse. The concern, as far as I can tell, is that a majority of legislators will be able to implement as law their views of social and economic policy at the expense of the minority. Legislation should not be questioned as unconstitutional simply because a majority of the people may benefit from it and a minority of the people may not. Legislation, by its very nature, presents the risk of majoritarian abuse; a majority is required to pass legislation. The legislature rightfully weighs competing interests and determines, by majority vote, what is best for society as a whole. Our system of government vests this obligation in the legislative branch. Accordingly, I think we should interpret the Open Courts Clause so as to permit the legislature to define, change, and modernize the law for the benefit of society.

¶ 101 The real danger presented by the *Berry* test is that of majoritarian abuse by the members of this court. The risk, in my mind, lies in requiring that new legislation satisfy the policy predilections of a majority of the members of this court by providing, in the eyes of this court, an adequate alternative remedy; or by eliminating what is viewed as a clear social or economic evil by this court. By continuing to adhere to *Berry*, we are overstepping our constitutional role. The constitution vests power in the legislature to implement, as law, the will of the majority of the citizens of this State. In short, I think that the perceived "risk of majoritarian abuse" by the legislature is not a sufficient reason for interpreting the Open Courts Clause to limit the prerogative of the legislature to circumscribe under what circumstances to permit recovery against the state. In my view, the greater risk lies in a majority of the members of this court substituting their policy judgments for the policy judgments of the legislature.

¶ 102 Third, the *Berry* interpretation assumes that each individual who suffers an injury to his or her person, property, or reputation, is constitutionally entitled to a remedy. The idea that a remedy can be fashioned for every injury is optimistic and well-intentioned, but, as a practical matter, impossible. The law cannot, and therefore does not, guarantee a remedy for every injury. Not every injury can or must be remedied. "There is still such a thing as damnum absque injuria." *Masich v. United States Smelting, Ref. & Mining Co.,* 113 Utah 101, 128, 191 P.2d 612, 626 (1948)(Wolfe, J., concurring). This Latin phrase recognizes that loss or harm may occur without causing an injury in the legal sense. With good reason, the law does not permit recovery for many injured feelings, acts of God, and other injuries which are not compensable.

¶ 103 Individuals who have been injured in their persons, property, or reputation, are entitled to a remedy only when the law, statutory or common, recognizes an injury and permits a remedy. The Open Courts Clause should not be interpreted to provide a

right to a remedy. It should be interpreted to guarantee *access* to seek a judicial determination as to whether the law grants a remedy for the injury suffered. The courts, through the common law, may create remedies when public policy dictates that certain interests are worthy of protection and the legislature has not spoken. Likewise, the legislature creates remedies when it determines, as a matter of public policy, that certain interests are worthy of protection. If the law provides for a remedy, then the Open Courts Clause guarantees the right to seek that permitted remedy through the courts. The Open Courts provision of our constitution should not, however, be interpreted to guarantee, as a matter of constitutional law, the right to a remedy for every injury done to one's person, property, or reputation.

¶ 104 Moreover, *Berry* also infringes on legislative power by permitting this court to increase individual substantive rights while, at the same time, denying the legislature the ability to limit, abolish, or modify them. This "ratcheting effect" is completely controlled by this court; the legislature is powerless to abrogate any remedies or causes of action without the approval of this court. Under the past seventeen years of *Berry,* once the court has recognized a cause of action for a certain injury by way of common law, the legislature has effectively been prohibited from abolishing that right unless it provides an adequate alternative remedy (adequate according to a majority of the members of this court), or, if not, the legislation is in harmony with the policy perspectives of a majority of the members of this court. This ratcheting effect, in essence, permits this court to increase individual substantive rights while at the same time essentially denying the legislature the ability to limit, abolish, or modify them, unless of course, the court approves of the legislation as a matter of policy.

¶ 105 This limitation by the court is inconsistent with the roles of judicial and legislative branches in our system of government. The legislature is authorized, even obligated, to change the law as the needs of society change. In *Masich,* we noted that "both statutory rights and common law rights can be taken away[;] otherwise, there can be no question that acts which abolish actions for seduction, breach of promise, criminal conversation, and alienation of affections, would be unconstitutional." 113 Utah at 124–25, 191 P.2d at 624. Justice Wolfe, speaking directly to the question of the legislature's power to change the common law, wrote, "I do not understand that Article I, Sec. 11, of the Constitution of Utah, prohibits the modification or even the entire removal or destruction of a common law right by legislative enactment." *Masich,* 113 Utah at 128, 191 P.2d at 626 (Wolfe, J., concurring). "The right and power, as well as the duty, of creating rights and to provide remedies, lies with the Legislature, and not with the courts." *Brown v. Wightman,* 47 Utah 31, 34, 151 P. 366, 367 (1915). "Courts can only protect and enforce existing rights, and they may do that only in accordance with established and known remedies." *Id.* In my view, the Open Courts Clause should not be interpreted to guarantee a remedy for every injury previously recognized by the law because to do so would unduly restrict the legislature in its legitimate lawmaking function. I am of the opinion that it is the prerogative of the legislature to decide under what circumstances the State will waive its sovereign immunity and open the public coffers to claimants.

¶ 106 Of great concern to me is that the *Berry* test violates article V, section 1, the Separation of Powers Clause. In its amicus brief, the State argues that the *Berry* interpretation of the Open Courts Clause violates the separation of powers provision in the Utah Constitution because it limits the power of the legislature to determine what causes of action will be recognized as having a legal remedy, and what causes of action will not. This position, in my mind, is compelling.

¶ 107 Article V, section 1 of the Utah Constitution reads:

> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

The *Berry* test places this court in the position of sitting as a second legislature, re-weighing the social or economic policy, instead of analyzing, as other methods of constitutional analysis do, whether the law is rationally related to its avowed purpose. In my view, the current Open Courts interpretation and the *Berry* test place the judiciary in the incongruous position of evaluating social or economic evils, "whether there is a clear social or economic evil to be eliminated," and permitting the social or economic policy of three judges to be substituted for the policy of the Legislature, the people's elected representatives. Further, this court reviews whether, when new legislation is passed, a prior remedy is adequately replaced with a new remedy. This court should not pass judgment on legislative policy such as whether a new remedy is as good as the old one, whether the substitute remedy is "substantially equal in value" to the old one. Substitution of the policy of three or more judges for the policy of the legislature, absent specific constitutional authority, is contrary to our system of government. By continuing to apply the *Berry* test, our case law usurps legislative power to "define, change, and modernize the law."

¶ 108 As Justice Crockett stated in *Stoker v. Stoker*, this court should leave it to the legislature, who represent the will of the people, and whose function and prerogative it is to discuss and consider public policy and enact into law those policies that, in their judgment, best serve the public welfare. 616 P.2d 590, 592 (Utah 1980) (Crockett, J., dissenting). We should adhere to the constitutionally prescribed separation of powers doctrine, and not intrude into the legislature's prerogative to change the law. *Id.* Instead, we should exercise judicial restraint, keeping our ideas as to what the law ought to be in check. *Id.* In upholding the constitution and ensuring that the legislature *does* not step outside of its constitutional restraints, we must not permit ourselves to stray into the legislative arena, thereby creating the risk that the policy judgment of three or more members of this court as to what the law ought to be will override the policy judgment of the legislative body, those most directly accountable to the people.

¶ 109 In my judgment, when presented with constitutional challenges to legislation, the role of this court is not to pass judgment on the wisdom of the legislature. "This court cannot ignore or strike down an act because it is either wise or unwise. The wisdom or lack of wisdom is for the legislature to determine. If the act is unjust, amendments to correct the inequities should be made by the legislature and not by judicial interpretation." *Masich*, 113 Utah 101, 126, 191 P.2d 612, 625 (1948). The *Berry* interpretation results in this court passing judgment on legislative wisdom—whether an alternative remedy, if any, is adequate or reasonable; and if not, whether the new law eliminates a clear social or economic evil. It permits this court to declare as unconstitutional, legislation that three members of the court deem unwise.

¶ 110 Because I would disavow the *Berry* interpretation of the Open Courts Clause and its analytical model, I would, for the present, return to the case law interpreting the Open Courts Clause prior to *Berry*. In my view, this interpretation maintains, rather than strains, the framework of our three-branch system of government as established by the constitution.

¶ 111 Prior to *Berry*, this court actually addressed whether sovereign immunity violates the Open Courts Clause. In *Madsen v. Borthick*, we said:

> Article I, § 11 of the Utah Constitution, which prescribes that all courts shall be open and persons shall not be barred from using them to redress injuries, was not meant to create a new remedy or a new right of action. Consequently, Article I, § 11 worked no change in the principle of sovereign immunity, and sovereign immunity is not unconstitutional under that section.

658 P.2d 627, 629 (Utah 1983) (citation omitted); *accord McCorvey v. Utah State Dep't of Trans.*, 868 P.2d 41, 49 (Utah 1993) ("As stated, the right to sue the state when it performs a governmental function, as constitutionally defined, does not implicate a right protected by the open courts provision." (citations omitted) (Stewart, J., concurring and dissenting)); *see also, Burton v. Exam Cen-*

*ter Indus. & General Med. Clinic, Inc.*, 2000 UT 18, ¶ 18, 994 P.2d 1261 (citing *Brown v. Wightman*, 47 Utah 31, 151 P. 366 (1915), for the proposition that article I, section 11 does not create a substantive right to a remedy). I am of the opinion that it is the prerogative of the legislature to decide under what circumstances the State will waive its sovereign immunity, opening the public coffers. I would not strike down section 63–30–2(4)(a) as unconstitutional, but uphold the legislation, a holding that would comport with *Madsen:* that the Utah Governmental Immunity Act, which defines the scope of sovereign immunity, is not unconstitutional under the Open Courts Clause.

¶ 112 I agree that the Open Courts Clause places limitations on legislative authority. The limitation, however, is not one that curbs the legislature's ability to define, change, and modernize the law. I interpret the Open Courts Clause as a limitation on legislative authority to reduce or inhibit the ability of the judiciary to resolve the disputes of the people, awarding remedies to those injured under the law. The legislature is prohibited from taking action that would hinder or preclude the judiciary from conducting the business of resolving cases and controversies, deciding cases by applying the law, as promulgated by the legislature, to factual circumstances on a case by case basis.

¶ 113 It is my opinion that before *Berry*, this court tacitly interpreted article I, section 11 as a procedural protection and not a substantive guarantee or right to a remedy. *See, e.g., Brown*, 47 Utah at 34, 151 P. at 367 (declaring that many states have read open courts provisions to prevent the legislature from barring "any person who has a legal right which is enforceable in accordance with some known remedy" from access to the courts; indicating that the Open Courts Clause does not create a substantive right to a remedy beyond the rights and remedies created by common law or statute; and noting that the right and power of creating rights and remedies lies with the legislature); *Madsen*, 658 P.2d at 629 (stating that "Article I, § 11 . . . was not meant to create a new remedy or a new right of action."); *see also Celebrity Club Inc. v. Utah Liquor Control Comm'n*, 657 P.2d 1293, 1296 (Utah 1982) (describing the article I, section 11 guarantee

as one of "access to the courts"); *Zamora v. Draper*, 635 P.2d 78, 81 (Utah 1981) (describing the guarantee of article I, section 11, to be an "assurance that everyone must have access to the courts to avail themselves of the process of justice. . . ."); *Burningham v. Ott*, 525 P.2d 620, 623 (Utah 1974) ("The carrying out of this constitutional assurance [article I, section 11] requires that any person who has, or thinks he has, a right to protect or a wrong to rectify, be entitled to go to court and air his grievance and have the difficulty resolved by the peaceable processes of justice.") (Crockett, J., concurring, but dissenting in part). I would return to this procedural interpretation of the Open Courts Clause.

¶ 114 I agree that our state constitution may, under some circumstances, " 'provide greater protections for our citizens than are required under the federal constitution.' " *Berry*, 717 P.2d at 677 (quoting *Daugaard v. Baltic Coop. Bldg. Supply Ass'n*, 349 N.W.2d 419, 425 (S.D.1984)). However, I do not interpret article I, section 11, of the Utah Constitution to provide a substantive right to a remedy beyond that which the legislature grants, modifies, or limits. Even *Berry* recognized that "one of the important functions of the Legislature [is] to change and modify the law that governs relations between individuals as society evolves and conditions require." *Berry*, 717 P.2d at 676. It is the prerogative of the legislature to change and modify what constitutes an injury entitled to a remedy. Consequently, article I, section 11, should not be read to prohibit the legislature from defining what constitutes a governmental function entitled to governmental immunity as it did in the Utah Governmental Immunity Act.

¶ 115 In my opinion, Utah case law prior to *Berry* interprets the Open Courts Clause as a procedural protection. The real break from stare decisis was when this court "broke new ground" in *Berry* with the current more substantive interpretation given to the Open Courts Clause and the invention of the accompanying *Berry* test.

¶ 116 In *Brown v. Wightman*, this court addressed whether a plaintiff could recover from the estate of the deceased defendant

who shot and killed himself after injuring the plaintiff. 47 Utah 31, 32, 151 P. 366, 366 (1915). After holding that the death of the wrongdoer abated plaintiff's action, thereby preventing the plaintiff from recovering, *id.* at 33, 151 P. at 366, the court addressed the plaintiff's argument that the Open Courts Clause guaranteed her the right to maintain an action against the defendant's estate, *id.* at 33–34, 151 P. at 366. The court listed other state constitutions that contained similar "Open Courts" provisions, and stated:

> The courts have, however, always considered and treated those provisions, not as creating new rights, but as placing a limitation upon the legislature to prevent that branch of the state government from closing the doors of the courts against any person who has a legal right which is enforceable in accordance with some known remedy. Where no right of action is given, however, or no remedy exists, under either the common law or some statute, those constitutional provisions create none.

*Id.* at 34, 366–67. While I agree that the provision places a limitation on the legislature, I disagree with the limitation espoused by the *Berry* interpretation. The majority opinion's interpretation emphasizes solely that the Open Courts Clause places a limitation on the legislature. It fails to note, however, the rest of the language in *Wightman* that the Open Courts Clause places "a limitation upon the legislature *to prevent that branch of the state government from closing the doors of the courts* . . . ." *Id.* Further, *Wightman* states that the courts must be open to "any person who has a legal right which is enforceable in accordance with some known remedy[, and w]here no right of action is given, however, or no remedy exists, under either the common law or some statute, those constitutional provisions create none." *Id.* This language, in my view, reveals that the *Wightman* court viewed the Open Courts Clause as a more procedural guarantee, like I do, and unlike the *Berry* proponents. *Wightman* respects the constitutional right and authority of the legislature to determine the circumstances under which a right of action or remedy is created, "under either the common law or [by] statute," with the Open Courts Clause "creat[ing] none."

The *Wightman* court continued, "While the common-law rule is a harsh one, and its enforcement in this case is particularly unjust, we nevertheless can see no way of escaping it. The right and power, as well as the duty, of creating rights and to provide remedies, lies with the Legislature, and not with the courts. Courts can only protect and enforce existing rights, and they may do that only in accordance with established and known remedies." *Id.*

¶ 117 *Lyman v. National Mortgage Bond Corp.* also suggests a procedural interpretation. In *Lyman,* plaintiffs sought to quiet title to land that they claimed to own by receipt of a tax deed and by adverse possession. 7 Utah 2d 123, 124, 320 P.2d 322, 322 (1958). By statute, the holder of a tax title to real estate was required to demonstrate payment of taxes assessed upon the property for four years prior to the tax delinquency. *Id.* at 124, 320 P.2d at 323. The defendants conceded that the plaintiffs had produced sufficient evidence of ownership by adverse possession, but argued that the tax deed was insufficient because the plaintiffs failed to prove taxes had been paid for the four years before the prior landowner was delinquent, even though the evidence was clear that all the necessary taxes had been paid since 1941. *Id.* The court considered the constitutionality of this legislation that, according to the court, forbade the commencement of an action or defense claiming ownership unless the plaintiffs "seized, possessed or occupied" the property for four years prior to filing suit. Two justices, Justice Wade and Justice Crockett, construed the statute so as not to bar the defendants from presenting their quiet title claim in court because to do so "would be in effect to deny them access to the courts to litigate a valid right to property[, and] this seems to be what the [Open Courts Clause] prohibits." In my view, these members of the court interpreted the Open Courts Clause to guarantee "access to the courts to litigate" one's rights and remedies, if any.

¶ 118 To me, *Salt Lake City v. International Association of Firefighters* suggests a procedural interpretation. In *International Association of Firefighters,* the court held unconstitutional a statute that required dis-

putes between firemen and municipal corporations regarding wages, hours, and other conditions of employment to be submitted to arbitration, where the arbitration process, as declared by the act, was final and binding on all matters in dispute except for salary and wage matters. 563 P.2d 786, 787–789 (Utah 1977). The majority opinion noted that the arbitrators were private citizens with no responsibility to the public and that the act did not include a safeguard of judicial review and then proceeded to declare the Act an unconstitutional delegation of legislative authority under Article VI, section 28. *Id.* at 789. Justice Crockett concurred separately, noting that for the legislature to "force arbitration upon the parties and to make it final and binding," forcing parties to proceed through a dispute resolution mechanism other than the courts for which there is no judicial review, "deprive[s] an aggrieved party of access to the courts, contrary to the assurance of Section 11, Article I, [the Open Courts Clause]." *Id.* at 791. In my view, the legislation reviewed in *International Association of Firefighters* violated the Open Courts Clause because it "deprive[d] an aggrieved party of access to the courts," and had the majority not held that the legislation was an unconstitutional delegation of legislative authority under Article VI, section 28, it would have followed Justice Crockett.

¶ 119 In *Stoker v. Stoker*, the court determined that the legislature had completely abolished the antiquated doctrine of Interspousal Tort Immunity, which had prohibited a married woman from suing for injury to person or property without her husband's consent and prohibited her from being sued individually. 616 P.2d 590, 591 (Utah 1980). The legislature declared that married women could "prosecute and defend all actions for the preservation and protection of her rights and property as if unmarried...." *Id.* The court interpreted this legislation to permit a married woman to sue her husband for an intentional tort, and noted that the Open Courts Clause—which guarantees that "every person, for an injury done to him in his person, property or reputation, shall have remedy by due·course of law, which shall be administered without denial or unnecessary delay [in a court of law]"—lent "credence to [their] interpretation of the statute," suggest-

ing that women as well as men were permitted access to the courts to have their legal disputes resolved. *Id.* Justice Crockett dissented, discussing the dangers of "judicial legislation," as he viewed the majority opinion as an usurpation of the constitutional role of the legislature to change or modify the law. *Id.* at 592–94. Justice Crockett advocated that the law should not have been changed by the court, but by the legislature. *Id.* at 594. In my mind, the majority viewed the Open Courts Clause as guaranteeing a procedural right to all citizens, male and female, to seek a judicial remedy through litigation in the "open courts" of this state.

¶ 120 *Burningham v. Ott* also supports a prior procedural interpretation. In *Burningham*, the plaintiff apparently promised the defendant that the defendant's stock in the plaintiff's company would increase in value. 525 P.2d 620, 620 (Utah 1974). The plaintiff sued for fraud, but the court granted summary judgment, which was affirmed on appeal. *Id.* at 620–22. In a separate opinion discussing why "summary judgments should be invoked with caution and restraint," Justice Crockett stated, "[Utah's] founding fathers were fully aware that access to the courts for the settlement of controversies is essential to the peace and good order of society." *Id.* at 623. He then recited article I, section 11 and continued, "The carrying out of this constitutional assurance requires that any person who has, or thinks he has, a right to protect or a wrong to rectify, be entitled to go to court and air his grievance and have the difficulty resolved by the peaceable process of justice." *Id.*

¶ 121 In *Zamora v. Draper*, the plaintiff challenged the constitutionality of a statute that required, in order to sue a sheriff, constable, or peace officer for an act or omission committed in the performance of his or her duty, the filing of "a written undertaking with two sufficient sureties" for payment to defendant of all costs and expenses that may be awarded against the plaintiff. 635 P.2d 78, 79–80 (Utah 1981). The plaintiff claimed that he should not have to furnish the bond because of his impecuniosity, and he challenged the statute as unconstitutional. The court upheld the act as constitutional, and in discussing the impecuniosity alleged by the

plaintiff, stated, "This assurance that everyone must have access to the courts to avail themselves of the process of justice is implemented in [the statutes permitting indigent persons to file suit upon oath without filing the required fees]." The court further described the guarantee provided by the Open Courts Clause as the "right to access to the courts" and stated that permitting a trial court to fix a bond in accordance with an indigent plaintiff's circumstances would "allow him access to the court to seek justice, as assured by Sec. 11 of Article I of our State Constitution...." *Id.*

¶ 122 Even cases since *Berry* have suggested that the Open Courts Clause is a procedural guarantee, a guarantee of "reasonable access to judicial review."

¶ 123 Legislation limiting or impairing the right to file a petition for a writ of habeas corpus has been declared unconstitutional based, in part, on the Open Courts Clause. *See, e.g., Julian v. State,* 966 P.2d 249, 253 (Utah 1998); *Frausto v. State,* 966 P.2d 849, 850–51 (Utah 1998) (discussing *Julian* ); *see also Currier v. Holden,* 862 P.2d 1357, 1372 (Utah Ct.App.1993) (declaring Utah Code Ann. § 78–12–31.1 (1992) to be unconstitutional solely under article I, section 11). This court has even used the Open Courts Clause to guarantee citizens a *procedural* right to access to the courts to protect certain individual rights. *See, e.g., Jenkins v. Percival,* 962 P.2d 796, 799 (Utah 1998) (suggesting a right of access to the courts and a constitutional guarantee of "a day in court"); *Jensen v. State Tax Comm'n,* 835 P.2d 965, 969 (Utah 1992) (finding that "to the extent that [Utah Code Ann.] § 59–1–505 precludes reasonable access to judicial review, it violates the open courts provision"); *Maryboy v. Utah State Tax Comm'n,* 904 P.2d 662, 670–71 (Utah 1995) (finding that petitioners constitutional right of open access to the courts was not violated because petitioners had the ability to pay the alleged tax deficiency); *Indus. Comm'n v. Evans,* 52 Utah 394, 174 P. 825 (Utah 1918).

¶ 124 In *Julian,* we held that the four-year catch-all statute of limitations provision for post-conviction relief violated article V, section 1, the separation of powers provision, and article I, section 11, the Open Courts Clause. 966 P.2d at 253. *Julian* arose after the legislature enacted a one-year statute of limitations in response to the ninety-day statute of limitations being declared unconstitutional. *Id.* at 251. After asserting that "[t]he separation of powers provision, Article V, Section 1 of the Utah Constitution, requires, and the Open Courts Provision of the Declaration of Rights, Article I, Section 11, presupposes, a judicial department armed with process sufficient to fulfill its role as the third branch of government," *id.* at 253, the lead opinion announced that "[to apply] the catch-all statute to bar habeas petitions not only violates the Utah Constitution's open courts provision in article I, section 11, but also violates the separation of powers provision in article V, section 1." *Id.* Inasmuch as this court has adamantly insisted that the legislature "may not impose restrictions which limit the writ [of habeas corpus] as a judicial procedure, except as provided in the constitution," we should also refrain from placing ourselves in a legislative role, imposing our policy judgments upon the legislature, except as clearly provided in the constitution, which the Open Courts Clause, in my mind, does not. If we hold that "the legislature may not impose restrictions which limit the writ as a judicial rule of procedure, except as provided in the constitution" because " 'the Writ belongs to the judicial branch of government' " and " 'is one of the most important of all judicial tools for the protection of individual liberty,' " *Julian,* 966 P.2d at 253 (quoting *Hurst v. Cook,* 777 P.2d 1029, 1033–34 (Utah 1989)), we should also respect the constitutional role of the legislature and no longer read the Open Courts provision as limiting the prerogative of the legislature to change the law as to what remedies are available to injuries.

¶ 125 In *Jensen,* the plaintiffs failed to file proper state income tax returns beginning in 1978. 835 P.2d at 967. The State Tax Commission requested further information, to which Mr. Jensen claimed he was not required to file a state return. *Id.* In 1990, the Tax Commission sued the plaintiffs for $16,608 in back taxes. *Id.* at 968. The plaintiffs petitioned for a redetermination, to which the Collection Division responded by increasing the demand of back taxes to $344,419. *Id.* The Commission sustained the deficiency, and plaintiffs appealed to this

court. *Id.* As a preliminary issue, the court considered whether it had jurisdiction to review the Commission's ruling because plaintiffs failed to deposit the full amount of taxes, interest, and penalties as required by statute to obtain judicial review. After discussing the Open Courts Clause and *Industrial Commission v. Evans,* 52 Utah 394, 174 P. 825 (1918), the court stated, "[Plaintiffs] are in a position similar to the employer in *Evans* and have the right to test the legality of their liability under the ruling of the Tax Commission in a court of law." *Jensen,* 835 P.2d at 969. "The requirement that they deposit the full amount of the deficiency assessed by the Commission is, on the facts of this case, an effective bar to judicial review." *Id.* "Thus, to the extent that [the statute requiring tax protesters to deposit the amount of the deficiency assessed] precludes reasonable access to judicial review, it violates the open courts provision and is unconstitutional as applied." *Id.* This opinion clearly suggests a procedural guarantee within the Open Courts Clause, and, in my view, this is the type of case that the Open Courts Clause is equipped to address.

¶ 126 In *Maryboy v. Utah State Tax Commission,* members of the Navajo Native American Tribe protested income tax assessments. 904 P.2d 662, 664 (Utah 1995). They appealed the Utah State Tax Commission's decision that required them to pay $10,855.38 in taxes, penalties, and interest before they were allowed to appeal. *Id.* The protesters asserted that the Commission's order that they deposit the alleged tax deficiency "violated their constitutional right to have open access to the courts of this state." *Id.* at 670. The court then discussed the Open Courts Clause and its application in *Jensen,* but held that in the Maryboys' case, the statute requiring that the deficiency be deposited did not preclude reasonable access to judicial review because, unlike the protesters in *Jensen,* the Maryboys were able to pay the alleged deficiency.

¶ 127 In *Jenkins v. Percival,* 962 P.2d 796 (Utah 1998), this court cites *Jensen* and reads article I, section 11 as a *procedural* guarantee. This court said, "To impose liability on an insured for an amount over the policy limit in an arbitration proceeding would violate the insured's *right of access to the courts* under article I, section 11." 962 P.2d at 799 (emphasis added). *Jenkins* describes the Open Courts guarantee as one of "a day in court to all parties with potential liability in disputed insurance claims." *Id.*

¶ 128 Undoubtedly those who favor the *Berry* interpretation find both procedural and substantive guarantees within the language of the Open Courts Clause. It is my view, however, that the substantive *Berry* interpretation of the Open Courts Clause construes the Open Courts Clause in such a way as to infringe upon the province of the legislature, creating separation of powers problems that should be avoided.

¶ 129 Critics of the procedural interpretation of the Open Courts Clause insist that a more procedurally-oriented interpretation renders the Open Courts Clause meaningless, mere surplusage to procedural due process rights. The contention being that due process already guarantees, among other things, the right to judicial dispute resolution. On the other hand, though, to give the Open Courts Clause a substantive interpretation arguably renders the Open Courts Clause provision meaningless as surplusage to substantive due process rights. Instead of relying on the Open Courts Clause for authority, one could just as credibly argue a substantive due process right to a remedy for injury done to one's person, property, or reputation. That said, regardless of one's view as to whether the language guarantees procedural rights to open courts or whether it guarantees the right to a remedy, the responsibility before us is simply to interpret the Open Courts Clause so as to give it meaning and effect without doing violence to other constitutional doctrines. In my view, the current interpretation goes beyond the language of the provision, which I deem unnecessary, and crosses bounds set forth in the separation of powers clause of the Utah Constitution.

¶ 130 It is my position that *Berry* indeed broke new ground and charted a course that, although well-intentioned, has proven to be misguided. The constitutional problems that have arisen and will continue to arise through application of the *Berry* test, particularly the separation of powers problem, should be averted by overturning *Berry* and returning to the more procedural interpreta-

tion that existed prior to *Berry*. For me, the case law prior to *Berry,* a contextual analysis of the Open Courts language, problematic decisions since *Berry,* and the responsibility to interpret the constitution in such a way so as to recognize the proper role of each branch of government in relation to each other all point toward abandoning *Berry.*

¶ 131 In my opinion, the text of the Open Courts Clause clearly supports a more procedural guarantee. "In interpreting the state constitution, we look primarily to the language of the constitution itself. . . ." *Grand County v. Emery County,* 2002 UT 57, ¶ 28, 52 P.3d 1148 (quoting *State v. Gardner,* 947 P.2d 630, 633 (Utah 1997)). "Therefore, our starting point in interpreting a constitutional provision is the textual language itself." *Gardner,* 947 P.2d at 633.

¶ 132 The text of the Open Courts Clause indicates that article I, section 11, guarantees procedural rights; to the extent that it limits legislative authority, it prevents the legislature from restraining or otherwise inhibiting the ability of the people to go to the courts to have their cases and controversies adjudicated. The Open Courts Clause can be separated into "four interrelated phrases: [14] (i) 'All courts shall be open,' (ii) 'every person, for an injury done to him in his person, property or reputation,' (iii) 'shall have remedy by due course of law,' and (iv) 'which shall be administered without denial or unnecessary delay.' " *Craftsman,* 974 P.2d at 1235 (Zimmerman, J., concurring in the result). The phrases are interrelated, and must be read together, in light of one another. These phrases, as a whole, guarantee a right to judicial adjudication where one has been injured to his or her person, property, or reputation. The first and fourth phrases are procedural in nature. "All courts shall be open" is an admonition that a court system shall be available for seeking redress. "[W]hich shall be administered without denial or unnecessary delay" directs the courts to conduct their business without undue delay. When read together, these phrases direct that a system of courts shall exist, that the court system shall be accessible, and that the system shall function so as to administer

justice under the law without unnecessary delay.

¶ 133 The second phrase, "every person, for an injury done to him in his person, property or reputation," is not a source of either a substantive or procedural right. This phrase defines the persons and the subject matter to which the open courts provision, and the guarantees it espouses, apply. It suggests that the provision applies to individuals who have suffered injury to their person, property, or reputation. As was discussed above, not all harm is a legally actionable injury. What constitutes a legally actionable injury depends on the statutory and common law of this state. Thus, whether one is entitled to a remedy depends upon whether the law permits a remedy, and in order to know whether the law permits a remedy, one must be able to have that question adjudicated. It therefore follows that the courts must be open to individuals for a determination of whether the harm they have suffered constitutes an injury under the law.

¶ 134 The third phrase has been the source of the substantive right to a remedy in *Berry* which has been used to limit the ability of the legislature to alter the law without judicial oversight. The phrase "right to a remedy" should be read in light of the phrase "by due process of law." The latter phrase modifies the former phrase. When read this way, one does not have a right *to* a remedy, but a right to access to the courts to *seek* a remedy, if the particular injury provides for one "by due process of law," or, in other words, through the other processes and procedures of the law.

¶ 135 Consequently, I interpret the text of article I, section 11 to provide a more procedural guarantee. It guarantees access and limits the authority of the legislature to limit citizen access to the courts for resolution of disputes by due process of law. The Open Courts Clause, in my view, does limit the authority of the legislature: The legislature may not close the doors to judicial resolution of disputes. "The courts shall be open" for the determination of whether a party is entitled to an established remedy under the law as established by the legislature. I would interpret the Open Courts Clause not to limit

14. In his dissent in *Craftsman,* Justice Zimmerman offered this useful analytic framework.

the authority of the legislature to define legal injuries and delineate the circumstances under which one may be entitled to a remedy, but to limit the ability of the legislature to deny a party access to a judicial officer for a determination of whether a particular set of facts and circumstances constitute a legal injury for which a remedy exists under the law.

¶ 136 Accordingly, in my view, the statute at issue, Utah Code Ann. § 63–30–2(4)(a), does not infringe upon the rights guaranteed by the Open Courts Clause as I interpret it. In my opinion, the present legislation, which preserves sovereign immunity for a governmental function, does not deprive individuals who have suffered injury to their person, property, or reputation, of access to our court system to seek a determination of whether their injury constitutes a redressable injury under the law for which they are entitled to a remedy. Section 63–30–2(4)(a) sets forth the law under which individuals may seek redress from the government. It also defines those circumstances under which an injury is not redressable under the law. Section 63–30–2(4)(a) exhibits the legislative prerogative to determine the scope of sovereign immunity and the circumstances under which it is waived. The legislature, subject as always to political pressures from constituents, has broad discretion in deciding whether recovery against governmental entities should be expanded or contracted and under what circumstances. Sovereign immunity does not infringe upon one's right to a judicial determination of whether particular facts constitute an injury which the law recognizes as entitled to a remedy. Section 63–30–2(4)(a) sets forth the law to be applied by the judicial officer to the facts presented by the individual who has suffered injury. As a result, I would uphold section 63–30–2(4)(a) as constitutional.

¶ 137 In my view it is the right and obligation of the legislature to waive sovereign immunity as it sees fit. While judicial exceptions to sovereign immunity do exist, it is the prerogative of the legislature to define the scope of sovereign immunity and the exceptions by which it is waived; the Open Courts Clause is not a limitation on the legislature's ability to define the scope of or waive sovereign immunity. Indeed, it is appropriate for the legislature to address the extent to which it is desirable to use public funds to compensate those injured by acts, omissions, or decisions of the government acting in the public interest.

¶ 138 I do not espouse deferring to legislative retention or expansion of governmental immunity which unreasonably burdens important constitutional rights. *See, e.g., Condemarin v. Univ. Hosp.*, 775 P.2d 348, 363 (Utah 1989). For me, the Open Courts Clause provides procedural rights which may not be infringed upon by the legislature.

¶ 139 In summary, I agree that the acts, omissions, or decisions of Fairview City to not raise the height of, insulate, or provide further warnings on its power lines fall within the discretionary function exception of the Utah Governmental Immunity Act, specifically Utah Code Ann. § 63–30–10. I would overrule *Berry* in favor of the more procedural interpretation seen in this court's jurisprudence both before and after *Berry*. Under this interpretation, it is my opinion that section 63–30–2(4)(a) does not violate Article I, Section 11. I would affirm the judgment of the trial court.

¶ 140 Associate Chief Justice DURRANT concurs in Justice WILKINS' dissenting opinion.